# IN THE SUPREME COURT OF CALIFORNIA

CURTIS OLSON,

Cross-complainant and Appellant,

v.

JANE DOE,

Cross-defendant and Respondent.

S258498

Second Appellate District, Division Eight

B286105

Los Angeles County Superior Court

SC126806

January 13, 2022

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, Groban, Jenkins, and Moor[*] concurred.

---

[*]     Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

OLSON v. DOE

S258498


Opinion of the Court by Liu, J.


Code of Civil Procedure section 527.6 provides a specialized procedure for a petitioner who has suffered harassment within the meaning of the statute to expeditiously seek a limited judicial remedy — injunctive relief to prevent threatened future harm. (All undesignated statutory references are to the Code of Civil Procedure.) A petitioner who also desires retrospective relief in connection with the same underlying conduct, such as tort damages, must do so separately.

Cross-defendant Jane Doe and cross-complainant Curtis Olson each own units in the same condominium building. Doe sought a civil harassment restraining order against Olson pursuant to section 527.6. As a result of court-ordered mediation, the parties agreed "not to contact or communicate with one another or guests accompanying them, except in writing and/or as required by law," to "go[] their respective directions away from one another" if "the parties encounter each other in a public place or in common areas near their residences," and "not to disparage one another."

The question here is whether the nondisparagement clause in the parties' mediation agreement potentially applies to and thereby limits Doe's ability to bring a subsequent unlimited civil lawsuit against Olson seeking damages. Doe later filed such a lawsuit; Olson cross-complained for breach of contract and specific performance, arguing that Doe's suit violated the

1

nondisparagement clause; and Doe moved to strike Olson's cross-complaint under the anti-SLAPP statute. We hold that the mediation agreement as a whole and the specific context in which it was reached — a section 527.6 proceeding — preclude Olson's broad reading of the nondisparagement clause. Accordingly, Olson has failed to show the requisite "minimal merit" on a critical element of his breach of contract claim — Doe's obligation under the agreement to refrain from making disparaging statements in litigation — and thus cannot defeat Doe's anti-SLAPP motion. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 94 (*Navellier*).)

## I.

Doe and Olson met in 2002 and worked together to acquire and preserve a historic apartment building. Olson acquired the building, converted the apartments into eight condominium units, and ultimately became the owner and part-time resident of one of the units. Olson served as the president of the building's homeowners association (HOA) board from 2013 to January 2016, and Doe resided in one of the condominium units.

In December 2016, Doe filed an unlimited civil lawsuit against Olson and various other defendants, including other residents of the building, the HOA, and the property management company. Through the complaint, Doe seeks damages for a variety of claims, including sexual battery, assault, and discrimination based on perceived ethnicity, religion, and marital status. The complaint alleges multiple romantic advances over a long period of time by Olson toward Doe, which Doe rejected, followed by "a pattern of retaliatory events" by Olson, friends and associates of Olson (some of whom resided in the building after purchasing units from Olson), and

the HOA. Doe ultimately moved out of the building for a period from 2009 to 2013.

The complaint further alleges that in May 2015, after Doe had resumed living in her unit, Olson invited her to meet with him in order to " 'bury the hatchet,' " and after socializing in the courtyard of the building, Doe accompanied Olson to his condominium unit to watch a short video on the internet that he was having difficulty loading. According to the complaint, Doe was sitting on a sofa in Olson's unit when Olson "forced himself on top of" her and "started touching her face, hair, and breasts and tried to kiss" her before she was able to struggle free and leave. After this incident, Doe alleges, Olson confronted her in the courtyard visibly upset, and over the ensuing months Olson and his associates continued to harass and stalk her by, for example, "peeping, filming, videotaping, and/or photographing [Doe] and her guests," including through the bedroom and bathroom windows of her condominium unit, which prompted Doe to file police reports.

The events described in the complaint initially prompted Doe to seek a civil harassment restraining order against Olson pursuant to section 527.6 in October 2015. Her request included allegations of sexual battery, peeping, harassment, and threats to Doe's life and property, and it sought both personal conduct and stay-away orders against Olson. The court granted Doe's request for a personal conduct order against Olson and issued a temporary restraining order, but the court denied Doe's request for a stay-away order in advance of a hearing.

Olson opposed Doe's request for a civil harassment restraining order, "vehemently deny[ing] th[e] allegations" in her request and asserting that the HOA "and its vendors have

had a well-documented history of problems with [Doe] in connection with her use and residency" at the building, including her continued use of a basement storage unit. At a hearing on December 10, 2015, the court ordered the parties to mediation supervised by a volunteer mediator from the California Academy of Mediation Professionals (CAMP). The parties then entered into single-page "Mediation" and "Mediation/Confidentiality" agreements that same day.

Pursuant to the mediation agreement, Doe's request for a civil harassment restraining order was dismissed without prejudice, and the parties agreed to resolve their dispute in pertinent part as follows: "(1) [Olson] denies each and every allegation made by [Doe] in the dispute. (2) This agreement is made voluntarily by mutual agreement of the parties, and nothing contained herein is to be construed as an admission of any wrongdoing of the parties. (3) The parties agree not to contact or communicate with one another or guests accompanying them, except in writing and/or as required by law. (4) Should the parties encounter each other in a public place or in common areas near their residences, they shall seek to honor this agreement by going their respective directions away from one another. (5) The parties agree not to disparage one another. (6) The term of this agreement shall be three (3) years."

According to Doe's civil complaint, harassment by the HOA board and other associates of Olson continued even after the mediation agreement was reached, including a demand by the HOA board in May 2016 that Doe pay a percentage of the legal fees incurred by Olson in connection with opposing the civil harassment restraining order. In August 2016, Doe filed an administrative complaint with the United States Department of Housing and Urban Development (HUD), naming Olson and the

HOA as respondents and alleging discrimination based on sex and gender. The administrative complaint was referred to the California Department of Fair Employment and Housing (DFEH) for investigation. In the administrative complaint, Doe claimed "discrimination based on sex and gender," alleging that Olson "stalked her," "subjected her to unwanted sexual comments and touching," took "pictures of [her] while she [wa]s in the bathroom and in her bedroom," and "used his position as board president to direct the maintenance man to install cameras in [her] unit," and that "as a result of the restraining order [Olson and the HOA] tied in a portion of the attorney fees to her home" such that "[i]f the balance[] is not paid in full a 10% monthly fee is added to the unpaid balance and they are able to foreclose on [her] property."

Doe subsequently filed a civil complaint against Olson and the other defendants seeking damages. In May 2017, Olson filed a cross-complaint against Doe for breach of contract damages and specific performance. The cross-complaint alleges that Doe breached the mediation agreement's nondisparagement clause by filing her administrative complaint and her civil complaint for damages, and it requests contract damages and an order for specific performance requiring Doe "to withdraw and dismiss all claims in this case, the HUD Complaint, and the DFEH Complaint against Olson or that otherwise disparage Olson."

Doe moved to strike Olson's cross-complaint under the anti-SLAPP statute, asserting that it was "retaliatory litigation" and "an attempt to chill Doe's exercise of her rights of free speech under the United States or California Constitution . . . and right to petition the courts and the executive branch for redress of grievances." (See § 425.16, subds. (b)(1), (e)(1) & (e)(4).) Doe argued that Olson could not establish a probability

of prevailing because "[t]here was an exception clause that expressly preserves Doe's right to sue and no release of all claims executed by Doe and Doe's Complaint and reports to HUD and DFEH are absolute [*sic*] privileged under California Civil Code § 47." Olson opposed the motion, arguing that the parties "agreed not to disparage one another for three years," that Doe breached that agreement by filing the administrative and civil complaints, and that "having contractually obligated herself not to disparage Olson, Doe is not entitled to th[e] protections" of the anti-SLAPP statute.

The trial court granted Doe's special motion to strike, and Olson appealed. The Court of Appeal affirmed in part and reversed in part. With respect to Doe's administrative complaint, the Court of Appeal agreed with the trial court and viewed *Vivian v. Labrucherie* (2013) 214 Cal.App.4th 267 as dispositive, concluding that applying the litigation privilege was necessary to promote full and candid disclosure to a public agency whose purpose is to protect the public from illegal activity and thus absolved Doe of any liability. With respect to Doe's civil complaint, however, the Court of Appeal disagreed with the trial court, concluding that the public policy underlying the litigation privilege did not support its application to Doe's complaint. The Court of Appeal further concluded that Olson had demonstrated the minimal merit needed to pass the second prong of the anti-SLAPP inquiry with respect to his breach of contract claim for damages but had failed to do so with respect to his claim for specific performance. We granted review to decide under what circumstances the litigation privilege of Civil Code section 47, subdivision (b) applies to contract claims, and whether an agreement following mediation between the parties in an action for a civil harassment restraining order, in which

they agree not to disparage one another, can lead to liability for statements made in a later unlimited civil lawsuit arising from the same alleged misconduct.

## II.

The parties' dispute centers on the construction of their mediation agreement, which was reached within the context of a civil harassment restraining order proceeding. (§ 527.6.) We begin with some background on this specialized civil procedure.

The Legislature enacted section 527.6 in 1978 in order "to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution." (Stats. 1978, ch. 1307, § 1, p. 4294; see Cal. Const., art. I, § 1.) The provision was intended to " 'establish an expedited procedure for enjoining acts of "harassment" ' " in order " 'to provide quick relief to harassed persons.' " (*Smith v. Silvey* (1983) 149 Cal.App.3d 400, 405 (*Smith*).) In the Legislature's view, "procedures under [then-]existing law" — namely "a tort action based either on invasion of privacy or on intentional infliction of emotional distress" — were "inadequate to remedy the mental and emotional distress suffered by a person," and "[t]he length of time it takes to obtain an injunction in many cases is too long." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3093 (1977– 1978 Reg. Sess.) as amended June 19, 1978, pp. 1–2.) Section 527.6, subdivision (a)(1) enables a victim of "harassment" to "seek a temporary restraining order and an order after hearing prohibiting harassment." In its current form, section 527.6 provides "for the issuance of a temporary restraining order without notice . . . on the same day that the petition is submitted to the court" (§ 527.6, subd. (e)) and generally requires the court to hold a hearing on the petition within 21 days (*id.*, subd. (g)).

"If the judge finds by clear and convincing evidence that unlawful harassment exists, an order shall issue prohibiting the harassment." (*Id.*, subd. (i).)

Thus, "section 527.6 provides a quick, simple and truncated procedure . . . and was drafted with the expectation that victims often would seek relief without the benefit of a lawyer." (*Yost v. Forestiere* (2020) 51 Cal.App.5th 509, 520 (*Yost*).) To that end, section 527.6 from its inception has required the Judicial Council to develop forms for use in these proceedings (Stats. 1978, ch. 1307, § 2, subd. (k), p. 4296; see § 527.6, subd. (x)(1)), and current law requires that "[t]he petition and response forms . . . be simple and concise, and their use by parties in actions brought pursuant to [section 527.6] is mandatory" (§ 527.6, subd. (x)(1)).

Section 527.6 has also made clear since its inception that utilizing this specialized civil procedure does not "preclude a plaintiff's right to utilize other existing civil remedies." (Stats. 1978, ch. 1307, § 2, subd. (j), p. 4296; see § 527.6, subd. (w).) "The quick, injunctive relief provided by section 527.6 'lies only to prevent threatened injury' — that is, future wrongs" — and "is not intended to punish the restrained party for past acts of harassment." (*Yost*, *supra*, 51 Cal.App.5th at p. 520, quoting *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 332.)

## III.

With this statutory context in mind, we consider the subject of Doe's special motion to strike Olson's cross-complaint: whether Doe's civil lawsuit violated the nondisparagement clause in the parties' mediation agreement arising from Doe's section 527.6 action seeking a temporary restraining order. (See § 425.16.) The question is whether such a nondisparagement

clause applies to statements made in a later unlimited civil lawsuit arising from the same alleged misconduct.

## A.

Pursuant to section 425.16, a party may file a special motion to strike a cause of action or particular claims underlying a cause of action that arise from activity protected by the anti-SLAPP statute. The moving party "must establish that the challenged claim arises from activity protected by section 425.16"; if the moving party does so, "the burden shifts" to the nonmoving party "to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*); see § 425.16, subd. (b)(1).) Before the trial court and on appeal, Olson conceded that Doe's administrative and civil complaints — the conduct that gave rise to Olson's actions for breach of contract and specific performance — constitute petitioning activity protected by section 425.16. Thus, the only issue before us is whether Olson has shown a probability of success. In that regard, we address only the breach of contract claim that Olson raised in the Court of Appeal: that Doe breached their agreement, not by suing him under his own name, but by filing the administrative and civil complaints against him. The Court of Appeal held that Olson "failed to prove the requisite minimal merit" for his claim for specific performance and affirmed that portion of the trial court's order, and Olson did not seek review. (*Doe v. Olson* (Aug. 30, 2019, B286105) [nonpub. opn.].)

To succeed in opposing a special motion to strike, the nonmoving party must "demonstrate both that the claim is legally sufficient and that there is sufficient evidence to establish a prima facie case with respect to the claim." (*Taus v.*

*Loftus* (2007) 40 Cal.4th 683, 714.) "[C]laims with the requisite minimal merit may proceed." (*Navellier*, *supra*, 29 Cal.4th at p. 94.) The moving party prevails by "defeat[ing]" the "claim as a matter of law" (*Baral*, *supra*, 1 Cal.5th at p. 385) in "a summary-judgment-like procedure" (*Taus*, at p. 714).

As relevant here, we recognized in *Navellier* that the anti-SLAPP statute can apply to a breach of contract claim, but the statute "preserves appropriate remedies for breaches of contracts involving speech" since "a defendant who in fact has validly contracted not to speak or petition has in effect 'waived' the right to the anti-SLAPP statute's protection in the event he or she later breaches that contract." (*Navellier*, *supra*, 29 Cal.4th at p. 94.) An essential element of Olson's breach of contract action is showing that Doe breached the mediation agreement. (E.g., *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821 [setting forth elements of breach of contract claim].) In light of the language of the nondisparagement clause, the mediation agreement as a whole, and the broader context in which the agreement was negotiated, we hold that the nondisparagement clause does not apply to statements made by Doe in the litigation context. Thus, Olson has failed to make a prima facie showing on this element sufficient to overcome Doe's special motion to strike.

The language of the nondisparagement clause is simple: "The parties agree not to disparage one another." Read in isolation, this language is vague as to its scope and conceivably could be understood to sweep broadly as Olson suggests. Yet a few reasons suggest that such a reading — i.e., one that prevents Doe from making any allegations potentially disparaging against Olson in future litigation — is foreclosed as a matter of law. (See *People v. Doolin* (2009) 45 Cal.4th 390,

413, fn. 17 (*Doolin*) ["[w]here . . . the meaning of [the] agreement does not turn on the credibility of extrinsic evidence, interpretation is a question of law"].)

First, the nondisparagement clause must be understood in connection with the mediation agreement as a whole. (See *Doolin, supra,* 45 Cal.4th at p. 413, fn. 17 ["Our interpretation of the agreement is guided by the basic principle that '[a]ny contract must be construed as a whole, with the various individual provisions interpreted together so as to give effect to all, if reasonably possible or practicable.' "].) It is one of only six numbered terms of the one-page agreement, and only three of those constitute the substantive terms intended to directly govern the prospective conduct of the parties. Apart from the nondisparagement clause, Doe and Olson agreed "not to contact or communicate with one another or guests accompanying them, except in writing and/or as required by law," and "to honor this agreement by going their respective directions away from one another" if "the parties encounter each other in a public place or in common areas near their residences." The purpose and primary focus of the mediation agreement is self-evident from the agreement as a whole: to set forth mutually agreeable parameters to govern the parties' potential future physical interactions with one other, including encounters rendered unavoidable by the fact that both owned condominium units in the same building.

The terms of Doe and Olson's agreement were handwritten. The mediator had apparently run out of the standard-issue, typed mediation agreements used at the courthouse. But the substantive terms contained in Doe and Olson's agreement nonetheless share substantial similarity with those contained in the version provided by the clerk in

response to a request for the "standard mediation agreement." The standard agreement provides: "The parties agree not to communicate with each other directly or through persons acting on their behalf . . . ." Further, although the standard agreement does not anticipate parties sharing a residential building, it says: "The parties agree to stay away from each other and their respective property, including but not limited to, their residences, places of employment, and personal property," and "[s]hould the parties encounter each other in a public place, they agree to continue going in their respective directions away from one another."

The standard-issue mediation agreement also has a nondisparagement clause of sorts. It provides that the "parties agree to not gossip about each other to anyone. The parties further agree to not comment . . . about each other to non-governmental 3rd parties unless specifically requested to do so. If they are asked to comment, they shall refer to each other using neutral terms and shall not use negative words or disparage one another." By specifically exempting "governmental 3rd parties" from its ambit, the form makes clear that such agreements are intended to prevent interpersonal third party "gossip" and rumor-spreading, not official filings with legal authorities. The similarities between Doe and Olson's agreement and the standard-issue form suggest that the parties did not intend something out of the ordinary with their agreement. The standard-issue form, moreover, makes clear that the typical nondisparagement clause is not intended to apply to litigation conduct.

Absent from either Doe and Olson's agreement or the standard mediation agreement are terms providing any release from liability or waiver of claims. Olson seeks a broad reading

of the nondisparagement clause, one that would effectively serve the purpose of those missing terms. Yet we must tread carefully in such circumstances. " 'Release, indemnity and similar exculpatory provisions are binding on the signatories and enforceable so long as they are . . . "clear, explicit and comprehensible in each [of their] essential details. Such an agreement, read as a whole, must clearly notify the prospective releasor or indemnitor of the effect of signing the agreement." ' " (*Skrbina v. Fleming Companies* (1996) 45 Cal.App.4th 1353, 1368, quoting *Powers v. Superior Court* (1987) 196 Cal.App.3d 318, 320.) Moreover, according to the terms of the agreement, Doe's section 527.6 petition was dismissed "without prejudice," in clear contemplation of the potential for further section 527.6 proceedings. A broad reading of the nondisparagement clause would render a dismissal without prejudice meaningless if Doe could be liable for breach of the mediation agreement were she to exercise her right to seek further section 527.6 relief against Olson or against any other party where the underlying factual allegations touch on Olson. Olson concedes that the mediation agreement does not limit Doe's ability to file a renewed petition for a restraining order against him; he agrees that Doe would not face contract damages for doing so. But he provides no reason to believe the parties intended to permit Doe to make disparaging remarks in one kind of litigation (a subsequent petition for a restraining order) but not in other litigation seeking a different type of relief.

The parties' agreements further suggest that they contemplated the possibility of future litigation outside of section 527.6 proceedings. The "Mediation/Confidentiality Agreement" between Doe and Olson says that "each party . . . understands and acknowledges that evidence presented during

this mediation may be verified outside of the mediation process and used as evidence in *subsequent legal proceedings*." (Italics added.) The mediation agreement itself also specifically provides, immediately above the signature line, that "this written settlement may be disclosed in a court of law. Upon disclosure, this agreement may be admitted as evidence and/or enforced as determined to be appropriate by the court." Thus, the parties' agreements as a whole counsel against an expansive reading of the nondisparagement clause.

Second, the mediation agreement is inextricably linked to the broader context in which it was negotiated — i.e., in a proceeding for a civil harassment restraining order. This context is critical. (See Civ. Code, § 1647 ["A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."]; *id.*, § 1648 ["However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract."].) Such a proceeding is statutorily designed to narrowly focus on interpersonal conflict. Its purpose, when warranted by the circumstances, is to prevent threatened future injury through a resulting "order enjoining a party from harassing, intimidating, molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, abusing, telephoning, including, but not limited to, making annoying telephone calls, as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, or coming within a specified distance of, or disturbing the peace of, the petitioner." (§ 527.6, subd. (b)(6)(A).)

The narrow focus of these proceedings is communicated to petitioners through instructions issued by the Judicial Council.

Judicial Council form CH-100-INFO explains that the purpose of a civil harassment restraining order is to "protect people from harassment." The instructions explain that in a civil harassment case, the court can "order a person to . . . [¶] [n]ot harass or threaten you[,] [¶] [n]ot contact or go near you, *and* [¶] [n]ot have a gun." But the court cannot, among other things, "[o]rder a person to pay money that he or she owes you."

That the petitioner in a section 527.6 proceeding has no ability to seek, and the court has no authority to order, redress of past wrongs through damages or otherwise does not mean that a petitioner waives the right to separately seek such other remedies merely by utilizing this specialized statutory procedure for imminent injunctive relief. To the contrary, the statute expressly provides that "a petitioner" is "not preclude[d] from using other existing civil remedies." (§ 527.6, subd. (w).) "Section 527.6 was passed to *supplement* the existing common law torts of invasion of privacy and intentional infliction of emotional distress by providing quick relief to harassment victims threatened with great or irreparable injury," not to supplant those complementary remedies. (*Grant v. Clampitt* (1997) 56 Cal.App.4th 586, 591, italics added.)

"Compromise agreements are, of course, 'governed by the legal principles applicable to contracts generally' . . . [and] 'regulate and settle only such matters and differences as appear clearly to be comprehended in them by the intention of the parties and the necessary consequences thereof, and do not extend to matters which the parties never intended to include therein, although existing at the time.' " (*Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 677.) We have applied this principle in a somewhat analogous context where we considered the meaning of the standard language used

to release claims and causes of action in workers' compensation settlements. (See *Claxton v. Waters* (2004) 34 Cal.4th 367.) Despite the broad language of the release at issue in *Claxton* — " 'releas[ing] and forever discharg[ing] said employer and insurance carrier from all claims and causes of action, whether now known or ascertained, or which may hereafter arise or develop as a result of said injury' " — we held that it "releases only those claims that are within the scope of the workers' compensation system, and does not apply to claims asserted in separate civil actions." (*Claxton*, at pp. 371, 376.) We construed this language in light of the statutory context governing workers' compensation — in particular, the statute focuses narrowly on eligible employee injuries where it provides the exclusive remedy; some claims based on conduct contrary to fundamental public policy are not subject to the scheme's exclusivity provisions; and other claims are not compensable or cognizable under the scheme at all and must be pursued separately. (*Id.* at pp. 372–374.) We also noted the goal of "quickly provid[ing] benefits" to "injured workers," the "informal rules of pleading [that] apply to such proceedings," and the fact that "workers may be represented by individuals other than attorneys." (*Id.* at p. 373.)

Similar reasoning applies here. As noted, a petitioner seeking a civil harassment restraining order and a court reviewing such a request are confined by the limited nature of section 527.6 proceedings. Tort and other actions seeking retrospective relief by way of damages for the conduct underlying a petition are not cognizable. It is clear from the statute and legislative history that section 527.6 proceedings are not intended to provide a forum for a global resolution of a petitioner's potential claims related to the underlying conduct

at issue. Rather, section 527.6 provides " 'an expedited procedure . . . to provide quick relief to harassed persons' " (*Smith, supra,* 149 Cal.App.3d at p. 405), not to the exclusion of a petitioner's right to seek other relief through traditional civil litigation and at a much slower pace (see § 527.6, subd. (w)). Like the workers' compensation scheme in *Claxton,* section 527.6 procedures are relatively informal, proceeding by "simple and concise" forms that parties are required to use (§ 527.6, subd. (x)(1)) and "with the expectation that victims often . . . seek relief without the benefit of a lawyer," as was the case here with Doe proceeding in propia persona (*Yost, supra,* 51 Cal.App.5th at p. 521).

Moreover, the specific procedures governing the mediation process for section 527.6 proceedings seem uniquely unsuited to expanding a section 527.6 mediation beyond the statute's narrow focus. The parties were referred to mediation on the day of the trial court hearing on Doe's petition. As amici curiae note, such mediations "are conducted only by court appointed specially trained mediators," "only on the court's premises," and agreements "must be agreed to and signed the same day, by the close of the courthouse day, which is usually about 4:30 p.m." If the parties fail to reach an agreement, an evidentiary hearing on the section 527.6 petition typically begins the following day. These procedures appear tailored to the narrow focus and expedited nature of section 527.6 proceedings; expanding the mediation to consider additional issues would run counter to the statutory purpose of " 'provid[ing] quick relief to harassed persons.' " (*Smith, supra,* 149 Cal.App.3d at p. 405.) This counsels skepticism toward reading an agreement reached through such a process to have far-reaching implications beyond the section 527.6 context.

Finally, it is undisputed that Doe's administrative and civil complaints constitute petitioning activity protected by section 425.16 and article I, section 3 of the California Constitution. (See *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115 [" 'petitioning activity involves lobbying the government, suing, [and] testifying' " and " ' "[t]he constitutional right to petition . . . includes the basic act of filing litigation or otherwise seeking administrative action" ' "].) Although the right to petition is somewhat differently situated from the right to a jury trial under article I, section 16 of the California Constitution (see Code Civ. Proc., § 631; *Grafton Partners v. Superior Court* (2005) 36 Cal.4th 944), the fact that Olson's broad construction of the nondisparagement clause in the mediation agreement would impair Doe's exercise of constitutional rights remains an important consideration. (*Janus v. American Federation of State, County & Mun. Employees, Council 31* (2018) 585 U.S. __, __ [138 S.Ct. 2448, 2486] [waiver of 1st Amend. rights "cannot be presumed" and, "to be effective, . . . must be freely given and shown by 'clear and compelling' evidence"].)

In sum, the mediation agreement as a whole, the statutory context in which it was negotiated, and the fact that it implicates constitutionally protected petitioning activity lead us to conclude that the nondisparagement clause does not apply to the circumstances here. Under the reading Olson urges, the clause would seem to constrain Doe's ability to further avail herself of the very protections provided by section 527.6, including filing another petition or utilizing the "other existing civil remedies" that the statute expressly preserves. (§ 527.6, subd. (w).) Under Olson's interpretation of the agreement, the nondisparagement clause would even apply to statements the

parties make in litigation involving third parties or about conduct occurring after Doe and Olson entered into the agreement. We see no indication that the parties understood the nondisparagement clause to sweep so broadly. Olson's reliance on the bare text of the clause, devoid of context and without more, is insufficient to proceed on a breach of contract claim in the face of an anti-SLAPP motion.

We are not confronted with factual circumstances that might make the anti-SLAPP question more difficult, such as conduct that falls somewhere between direct communication between the parties as contemplated by the mediation agreement and subsequent litigation. For example, this case does not concern whether the nondisparagement clause might apply to a concerted, hostile media campaign by one party against the other. We have no occasion here to address such a scenario. Olson has failed to show "the requisite minimal merit" to "proceed" on his breach of contract claim. (*Navellier*, *supra*, 29 Cal.4th at p. 94.)

## B.

Olson argues that Doe may "try to prove her tort causes of action" but "cannot shoot and miss without facing the penalty of contract damages." First, Olson analogizes the Court of Appeal's holding to the statutory provisions governing family law proceedings and custody determinations in the face of one parent's potentially false accusations of sexual abuse by the other. According to Olson, such family law provisions demonstrate "another context where the Legislature has recognized the incentive to make false accusations can be so great as to overwhelm the motivation for veracity." But the analogy does not hold. We are not confronted with how to apply

a highly reticulated statutory scheme reflecting the Legislature's sensitive policy judgments. This case turns on an ordinary question of contract interpretation that the Legislature likely did not contemplate when enacting section 527.6 or the anti-SLAPP statute.

Next, Olson contends that the answer to the question before us is "simple because the Court of Appeal's holding does not bar Doe's claims but allows Olson to plead and prove his." Olson's argument is that "the non-disparagement clause in the mediated agreement does not operate to 'bar' Doe's 'unlimited civil lawsuit' " because Doe can still proceed with her claims, just with the specter of breach of contract liability hanging over her head. This fails to respond to the substance of the question at hand. Whether the claim is that Doe cannot file suit or that she may be subject to damages liability for doing so is materially the same for purposes of assessing whether the nondisparagement clause applies to statements made in connection with subsequent litigation.

In Olson's view, even if Doe prevailed on her sexual battery claim, he could also prevail on his breach of contract claim and seek damages for economic injury based on reputational harm to offset any damages he owed her. Such an interpretation could require Doe to pay Olson after having successfully proven her case if his damages exceed those awarded to her. There are strong public policy reasons to refrain from such an interpretation. Not long after the mediation agreement in this case was signed, the Legislature clarified that a provision within a settlement agreement that prevents the disclosure of factual information related to sexual assault or harassment is prohibited. (Code Civ. Proc. § 1001, subd. (a)(1), (2); see Assem. Com. on Judiciary, Analysis of Sen. Bill No. 820

(2017–2018 Reg. Sess.) as amended June 20, 2018, pp. 3–4 [expressing concerns with confidentiality provisions in settlement agreements in cases involving sexual harassment and assault].) While Olson's interpretation of the clause would not prohibit Doe from revealing factual information, the specter of liability would clearly disincentivize it.

Olson is correct, of course, that generally speaking a party can "validly contract[] not to speak or petition" and thereby " 'waive[]' the right to the anti-SLAPP statute's protection in the event he or she later breaches that contract." (*Navellier*, *supra*, 29 Cal.4th at p. 94.) But the circumstances here are meaningfully different from what we have confronted in other cases.

In *Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, a tort settlement "included several provisions purporting to impose confidentiality obligations on the parties and their counsel," and counsel signed the agreement "under a notation that they approved [it] as to form and content." (*Id.* at p. 785.) Monster Energy subsequently sued counsel, alleging that public statements about the settlement constituted breach of the agreement. We held that Monster Energy had met its burden of showing the "minimal merit" needed to proceed on the breach of contract claim "[i]n light of the nature and extent of provisions in the agreement here purporting to bind counsel, and the other properly submitted evidence." (*Id.* at p. 796.) We specifically looked to the agreement's "numerous references to counsel as one whose keeping of confidentiality is assured," which "reflect[ed] an expectation that the confidentiality provisions would apply to counsel as well." (*Ibid.*) Thus, we found it "reasonable to argue that counsel's signature on the document evinced an understanding of the agreement's terms and a

willingness to be bound by the terms that explicitly referred to him." (*Ibid.*)

Whereas the agreement as a whole, together with extrinsic evidence, supported the breach of contract claim in *Monster Energy*, Olson relies solely on the text of the nondisparagement clause. Going beyond that isolated language, as we must, to consider the mediation agreement as a whole and the context in which it was negotiated undermines Olson's showing on a critical element of his claim: Doe had no obligation under the contract to refrain from making disparaging statements in litigation. Olson thus cannot defeat Doe's anti-SLAPP motion.

## C.

We also granted review to decide under what circumstances the litigation privilege of Civil Code section 47, subdivision (b) applies to contract claims. Because we conclude that Olson has not demonstrated a probability of success necessary to overcome Doe's anti-SLAPP motion, we need not and do not reach the question whether the litigation privilege also poses a barrier to Olson's claims. (See *Flatley v. Mauro* (2006) 39 Cal.4th 299, 323 ["The litigation privilege is also relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing."].) We note only that the approach we have taken here — carefully construing a clause that would effectively waive claims — is similar to the approach of courts that have assessed the application of the privilege in the context of a contract said to have waived it. (See *O'Brien & Gere Eng'rs. v. City of Salisbury* (Md. 2016) 135 A.3d 473, 489–491.)

## CONCLUSION

We reverse the judgment of the Court of Appeal insofar as it reversed the trial court's order granting Doe's special motion to strike the breach of contract cause of action with respect to statements in Doe's civil complaint.  We remand the matter for further proceedings consistent with this opinion.


**LIU, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**MOOR, J.**[*]

---

[*]	Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Olson v. Doe

_____

**<u>Procedural Posture</u>** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 8/30/19 – 2d Dist., Div. 8
**Rehearing Granted**

_____

**Opinion No.** S258498
**Date Filed:**  January 13, 2022

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Craig D. Karlan

_____

**Counsel:**

Buchalter, Robert M. Dato, Eric Michael Kennedy, Robert Collings Little and Paul Augusto Alarcón for Cross-complainant and Appellant.

Martinez Business & Immigration Law Group, Gloria P. Martinez-Senftner; Keiter Appellate Law, Mitchell Keiter; Sidley Austin, David R. Carpenter, Collin P. Wedel, Andrew B. Talai, Joel L. Richert, Paula C. Salazar; Bryan Cave Leighton Paisner, Jean-Claude André, Anne Redcross Beehler and Kristy Anne Murphy for Cross-defendant and Respondent.

Goodwin Procter, Neel Chatterjee, Alexis S. Coll-Very, Stella Padilla, Megan D. Bettles; Arati Vasan, Janani Ramachandran, Jennafer Dorfman Wagner, Erin C. Smith; and Amy C. Poyer for Family Violence Appellate Project and California Women's Law Center as Amici Curiae on behalf of Cross-defendant and Respondent.

Law Offices of Aimee J. Zeltzer and Aimee Zeltzer for John K. Mitchell and Dr. Jack R. Goetz-as Amici Curiae on behalf of Cross-defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Eric Michael Kennedy
Buchalter
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017
(213) 891-5051

Jean-Claude André
Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386
(310) 576-2148