Filed 10/27/23  Nelson v. Wells CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CHRIS NELSON, | B320223 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV48299) |
| v. | |
| NOEL WELLS, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gregory Wilson Alarcon, Judge.  Reversed.

Clark Hill, Bradford G. Hughes, Richard H. Nakamura, Jr. and Tiffany B. Hunter for Plaintiff and Appellant.

Liang Ly, Jason L. Liang and John K. Ly for Defendant and Respondent.

_____

A record producer sued a singer/songwriter for defamation. The dispute arose when respondent Noel Wells sent an e-mail to a music group about her experience while working on an album, two years earlier, with appellant Chris Nelson. Wells used the word "predatory" to describe Nelson's conduct.

Wells moved to strike Nelson's complaint as a Strategic Lawsuit Against Public Participation (SLAPP). The anti-SLAPP law allows courts to strike claims arising from a defendant's First Amendment activity "in connection with a public issue" unless the court determines that there is a probability that the plaintiff will prevail on the claim. (Code Civ. Proc., § 425.16, subd. (b)(1).)[1] The trial court granted Wells's motion.

On de novo review, we conclude that Nelson's lawsuit does not fall within the anti-SLAPP law. Wells's private e-mail about Nelson is not "speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) Nor is it "artistic speech." Because Wells did not establish a prima facie case, Nelson did not have to show a reasonable probability of prevailing on the merits. We reverse.

## FACTS AND PROCEDURAL HISTORY
### *Nelson's Complaint*

Nelson "is a well-established record producer, musician, and businessman." He owns a Los Angeles recording studio frequented by "well-known artists and musicians" who work with him or use his recording equipment. Nelson strives to promote diversity in music by working with "all musicians regardless of race, ethnicity, gender, or sexual orientation."

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

In 2020, Wells contacted music manager Tom Wironen, with whom Nelson had a professional relationship. Wells said Nelson was "predatory" toward her and other young female musicians. Nelson alleges that this false statement about him was "intended to interfere with and damage [his] business and working relationship with the music manager."

Nelson's complaint asserts causes of action for defamation; false light; intentional infliction of emotional distress; intentional and negligent interference with prospective economic relations; and seeks injunctive relief.

### Wells's Anti-SLAPP Motion

Wells moved to strike Nelson's complaint as a SLAPP, asserting that she was sued for exercising her right to free speech. Wells declared that she knew Nelson for seven years. In 2018, he offered his studio to record her first album, free of charge, and donated his services as producer; she only had to pay for a studio engineer. After they began, Nelson suggested recording more songs for a longer album on the same terms—free studio time and free producer services.

While Wells was recording, Nelson allowed other artists to interfere with her studio time. When she objected, he proposed changing their agreement, seeking 50 percent of the song-writing credit and 50 percent of the royalties. Wells was shocked. She felt Nelson's request was "unusual and out of line with industry norms, but it was also predatory and designed to take advantage of my naivete with the music industry."

When Wells confronted Nelson, he claimed his proposal was within industry standards. Disbelieving, she stopped recording with him. He ceased communication and refused to return the songs she recorded in his studio, which delayed the

3

release of her album.  Nelson returned the recordings to Wells after she hired a lawyer.  Wells was traumatized by her experience with Nelson.

Two years later, Wells saw an Instagram posting by one of her favorite bands, Big Thief, showing them in Nelson's studio. Big Thief asked people to recommend places "to create in" near Los Angeles.  Wells decided to "shar[e] my experience working with Plaintiff" in a private message she sent to Big Thief.

In an e-mail entitled, "Los Angeles recording space/Chris Nelson," Wells wrote that she saw "a photograph of you recording in Chris Nelson's space," saying "I feel it's important as a creative to let you know about that recording environment and what happened to me in case it informs your recording situation in the future."  Nelson "brought me into his orbit by claiming to let me use his space for free."  Later, "I began to realize that he was slowly changing the terms of our agreement which eventually ended with him trying to pull an incredibly predatory move on me.  Once I realized he was making these moves in bad faith, I attempted to end working with him and he [with]held my music from me . . . while refusing to communicate at all."

The e-mail continues, "I also witnessed incredibly predatory behavior from him toward young females including young female musicians, and I felt like because I had a slightly higher profile, he was using working with me to try and lure in other more naïve women into his orbit."  Noting Big Thief's popularity, Wells opined that "promoting [Nelson] and his space may invite other younger women to work with [him] who may not have the same protections in place as you have."  She closed by expressing hope that "there are some good safe spaces for you to be able to use while you visit Los Angeles."

4

Wells declared that she shared her experience to protect Big Thief. An artist's decision on who to work with and where to record has an "impact in the music world" and "on the quality of the music that is produced." Wells believed that working with Nelson would affect Big Thief's creative process.

Wells argued that her e-mail furthered "artistic speech" because it could affect a band's decision who to hire to create music. It involved "an issue of public interest" because the subject was someone in the public eye or could affect large numbers of people; the activity occurred in the context of an ongoing controversy, dispute, or discussion; or it affected a community similar to that of a governmental entity.

Wells asserted that Nelson cannot prevail on the merits. Her statements are not defamatory–they are personal opinions—and are privileged; she did not portray Nelson in a false light; there was no outrageous and extreme conduct causing emotional distress; Wells did not intend to contact Wironen; and there is no proof she interfered with a business opportunity.

### Nelson's Opposition

Nelson did not submit a declaration in support of his opposition. He argued that Wells's statements did not involve an issue of public interest. He is a private individual and the subject matter of her e-mail does not affect a broad segment of the population. In any event, Wells acted with actual malice, sending her e-mail *before* Big Thief requested studio recommendations on Instagram. Wells's statements were later posted on a site created by Nelson's ex-girlfriends as part of "a vengeance plot to destroy [his] reputation."

Nelson argued that he is likely to prevail on his claims. Wells's statements are defamatory per se: They allege that he

5

committed crimes and took advantage of female musicians or impugn his character by accusing him of unethical and predatory practices, without supporting evidence.

### *Wells's Reply*

Wells replied that she engaged in protected acts furthering artistic speech and concerning an ongoing, public discussion on social media about Nelson, a person in the public eye. His complaint alleges that he works with "numerous" artists, which could affect a substantial number of people.

Nelson did not show a probability of prevailing on his claims. He did not address her claim of privilege. Nor did he show with admissible evidence that she acted with malice or that any artist or manager stopped working with him after Wells's e-mail about her personal experience.

### *The Court's Ruling*

The court granted Wells's motion to strike Nelson's complaint. It deemed the incident "straightforward," involving Wells's e-mail to a music group advising it not to use Nelson's recording studio because he tried to change the terms of her agreement in a "predatory" manner. The court found that Wells's e-mail did not involve an issue of public interest. Nelson is not in the public eye; the e-mail was not shown to affect a substantial number of people; and there was no "ongoing" public discussion.[2] Her private e-mail did not enter the public sphere. Despite finding no issue of public interest, the court found this is "artistic speech" that advances or assists in the creation of music.

---

[2] The court noted that Wells sent her e-mail to Big Thief on July 16, 2020; the band posted its request for input on places to work the following day.

6

After finding a prima facie case to apply the anti-SLAPP law, the court found that Nelson did not show a probability of prevailing on the merits. He offered no declaration to establish the elements of his claims. He did not show he was defamed, placed in a false light, or suffered severe or extreme emotional distress; he presented no evidence that the statements disrupted any economic relationship or caused him harm.

### *Motion For Reconsideration*

Nelson sought reconsideration, citing a recent case involving commercial speech. He declared, "I never pulled a predatory move on defendant Wells," who thanked him for his work on her album. He offered 200 pages of new evidence, mostly text messages from 2018. Wells objected that the evidence was untimely and irrelevant, and the commercial speech case is inapposite. The court "did not discern a material change in law requiring reconsideration" and denied the motion.

## DISCUSSION

The anti-SLAPP law is construed broadly. (§ 425.16, subd. (a).) It is "a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity" (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384) "when those claims risk chilling 'continued participation in matters of public significance.' " (*Serova v. Sony Music Entertainment* (2022) 13 Cal.5th 859, 871.) An order granting an anti-SLAPP motion is appealable. (§ 425.16, subd. (i).) Our review is de novo. (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1250.)

A two-step analysis applies. First, the moving defendant must show that plaintiff's claims arise from activity protected by section 425.16. If protected activity is involved, the second step shifts the burden to the plaintiff to show a probability of

7

prevailing on the merits.  (*Baral v. Schnitt, supra,* 1 Cal.5th at pp. 384–385, 396; *Olson v. Doe* (2022) 12 Cal.5th 669, 678–679.)

### *Wells's E-mail Does Not Fall Within Section 425.16*

We focus on "the defendant's *activity* that gives rise to his or her asserted liability" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 92) and "whether the cause of action is *based* on the defendant's protected speech or petitioning activity." (*Id.* at p. 89.)  An act in furtherance of a person's constitutional rights includes the exercise of the "right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)[3]  The parties and trial court applied the public issue/public interest provision here.

In applying this provision, "First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates— a question we answer by looking to the *content* of the speech. (§ 425.16, subd. (e)(4).)  Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest.  It is at the latter stage that *context* proves useful." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149–150 (*FilmOn*), italics added.)  It "demands 'some degree of closeness' between the challenged statements and the asserted public interest." (*Id.* at p. 150.)

---

[3] A defendant "must demonstrate activity qualifying for protection" in one of the four categories listed in section 425.16, subdivision (e).  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 887–888 (*Wilson*).)  This subdivision also shields statements made in official proceedings or in public on matters of public interest.  (§ 425.16, subd. (e)(1)–(3).)

8

A public issue may be involved if "the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the direct participants' [citation] . . . and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation], or 'affect[ed] a community in a manner similar to that of a governmental entity' [citation]." (*FilmOn, supra*, 7 Cal.5th at pp. 145–146.)

Neither the complaint nor the evidence shows that Nelson is in the public eye.  He alleges he "is a well-established record producer, musician, and businessman" whose studio is used by "well-known artists and musicians."  Though Nelson's clientele may be in the public eye, Wells did not show that he sought or obtained public attention.  No evidence suggests that Wells's e-mail " 'could affect large numbers of people beyond the direct participants.' " (*FilmOn, supra,* 7 Cal.5th at p. 145.)  Her e-mail was private, sent directly to Big Thief to disparage Nelson's business practices.[4]

The complaint and evidence do not show that Wells's e-mail was part of " 'an *ongoing* controversy, dispute or discussion.' " (*FilmOn, supra,* 7 Cal.5th at pp. 145–146, italics added.)  Wells declares that she responded to Big Thief's post; however, her evidence belies the claim.  Wells sent her e-mail on July 16, 2020; Big Thief posted its request for input on creative workplaces on

---

[4] Wells's e-mail was addressed to "Big Thief" but Nelson's pleading alleges that it was sent to "Tom Wironen."  The parties do not explain the relationship, if any, between Wironen and Big Thief.  In any event, the e-mail was private, received by a music manager or a few band members.  The recipient does not affect our analysis of the motion to strike.

July 17, a day later. Wells's e-mail about Nelson and his studio was unsolicited, sent before Big Thief sought recommendations. Her dispute with Nelson was not ongoing, having ended two years earlier.

*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107 (*Du Charme*) is instructive. After Du Charme was terminated as a union manager, the union posted on its Web site a defamatory statement saying he was removed " 'for financial mismanagement.' " (*Id.* at pp. 110, 113.) The trial court ruled that section 425.16 did not apply. The post was not made in connection with an official proceeding nor was the issue one of public interest. (*Id.* at p. 112.)

The appellate court affirmed, finding that the union's post about Du Charme did not concern an issue of public interest. It did not impact " 'a broad segment of society' " or affect a community " 'in a manner similar to that of a governmental entity.' " The court distinguished a case in which members of a homeowner association with over 3,000 residents questioned the performance and competence of their association's general manager, part of an ongoing controversy aimed at changing the association's governance. (*Du Charme, supra,* 110 Cal.App.4th at pp. 115–116, 118, describing *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479–480.)

*Du Charme* states that use of a Web site "should not turn otherwise private information . . . into a matter of public interest." Statements must concern "a topic, person or entity of *widespread* public interest." (*Du Charme, supra,* 110 Cal.App.4th at p. 117.) The union's posting "was presumably of interest to the membership . . . but unconnected to any discussion, debate or controversy" because Du Charme's termination "was a fait

10

accompli; its propriety was no longer at issue." (*Id.* at p. 118.) "To grant protection to mere informational statements, in this context, would in no way further the statute's purpose of encouraging *participation* in matters of public significance." (*Ibid.*)

Wells's feeling of betrayal—when Nelson no longer wanted to work for free—is not a public issue or matter of public interest. The parties' 2018 business deal is not an ongoing controversy, dispute or discussion but a fait accompli occurring two years before the e-mail, which did not address a matter of widespread public significance. "[A]bsent unusual circumstances, a garden-variety employment dispute concerning a nonpublic figure will implicate no public issue." (*Wilson, supra*, 7 Cal.5th at p. 901.) Wells did not show that her e-mail "was made in connection with a public issue or an issue of public interest within the meaning of the anti-SLAPP statute." (*Du Charme, supra,* 110 Cal.App.4th at p. 119.)

The trial court found, as we do, that Wells's e-mail did *not* involve a public issue or matter of public interest. However, the court mistakenly viewed artistic speech as an alternative to the element of "public interest." This was legal error. Application of section 425.16, subdivision (e)(4) is expressly limited to issues of public interest. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117.)

Wells relies on "artistic speech" cases involving "casting decisions" in an artistic endeavor. For example, a television station acted " in furtherance of the right of free speech' " when selecting news anchors, which is "essentially casting decisions regarding who was to report the news" (*Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510, 1521), and news

11

reporting "is a matter of public interest." (*Id.* at p. 1527.) Likewise, "selection of a drummer is analogous to a 'casting decision[]' regarding who is to perform music during a concert or studio performance, and thus is 'an act in furtherance of the exercise of free speech,' " where the defendant's concerts "were of interest to the public" to whom he "sold millions of records and had hundreds of thousands" of followers on social media. (*Symmonds v. Mahoney* (2019) 31 Cal.App.5th 1096, 1106, 1109; see also *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 144 [public interest in writing, casting, and airing a popular show].) In *Wilson, supra,* 7 Cal.5th at pages 897–898, CNN's action in firing an employee for plagiarism was in furtherance of its speech rights because its broadcasts include "extensive 'speech in connection with a public issue or an issue of public interest.' " Although "[c]reating a television show is an exercise of constitutionally protected expression" (*Musero v. Creative Artists Agency, LLC* (2021) 72 Cal.App.5th 802, 816), the *private* misappropriation of script ideas did not contribute to a public conversation on a matter of public interest. (*Id.* at pp. 821–822; see also *Li v. Jenkins* (2023) 95 Cal.App.5th 493, 501 [private decision to exclude plaintiff from compensation and credit for a popular television show did not contribute to any public discussion of the show or its themes].)

Unlike the defendants in the cases cited above, Wells was not creating music with Nelson or Big Thief when she sent her disparaging e-mail. She was not taking constitutionally protected steps to advance her artistic endeavors, nor was she employed by Big Thief to help them create music. This is not akin to a casting decision by a person or entity who is creating and presenting shows to the public. Her unsolicited effort to

12

weigh in on Big Thief's future workplace is not itself creative or artistic speech. Her private message must meet the requirement that it involve a public issue or matter of public interest as stated in *FilmOn, supra*, 7 Cal.5th at page 149; however, the e-mail did not contribute to any public debate of widespread interest.

*"FilmOn.com*'s second inquiry requires us to determine whether a functional relationship exists between the speech in question and the public conversation about the issue of public interest. It is not sufficient that the speech merely ' "refer to a subject of widespread public interest; the statement must in some manner itself *contribute* to the public debate." ' (*FilmOn.com, supra*, 7 Cal.5th at p. 150 [citation], italics added.) In conducting this inquiry, we 'must consider the particular context of the speech, including the speaker's identity; the "purpose" of the speech; the nature of the audience and the intended audience; and the "timing" and "location" of the communication.' " (*Bishop v. The Bishop's School* (2022) 86 Cal.App.5th 893, 906; *Geiser v. Kuhns, supra,* 13 Cal.5th at pp. 1249–1250 [the defendant's statement must contribute to public discussion about an issue of public interest].)

Wells's e-mail about her recording agreement with Nelson and her feelings of personal betrayal are not "a subject of widespread public interest." Nor did the e-mail contribute to any ongoing public debate about recording contracts in general or Nelson in particular. Its only purpose was to privately disparage Nelson to a few people about an old, unhappy business deal.

### *Nelson Need Not Show a Probability of Prevailing*

We have concluded that Wells's e-mail did not satisfy the criteria in section 425.16, subdivision (e)(4). It is unnecessary to

determine the likelihood that Nelson would prevail on the merits. (*Du Charme, supra,* 110 Cal.App.4th at p. 119.)[5]

## DISPOSITION

The order granting the special motion to strike is reversed. Appellant is awarded costs on appeal.

NOT TO BE PUBLISHED.


KWAN, J.[*]

We concur:


CHAVEZ, Acting P. J.


HOFFSTADT, J.

---

[5] Though we need not address the merits in this pretrial anti-SLAPP motion, Wells may still challenge the substance of Nelson's claims on demurrer or in a motion for summary judgment or summary adjudication.

[*] Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.