Filed 5/22/23  L'Heureux v. Miller CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| STEPHEN L'HEUREUX, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> FRANK MILLER et al., <br><br> Defendants and Appellants. | B322839 <br><br> (Los Angeles County Super. Ct. No. 20STCV28241) |

APPEAL from an order of the Superior Court of Los Angeles County, Stephanie M. Bowick, Judge.  Reversed with directions.

Grodsky, Olecki & Puritsky, Allen B. Grodsky and Tim B. Henderson for Defendants and Appellants.

Pillsbury Winthrop Shaw Pittmam, Kenneth E. Keller, Alekzandir Morton and John J. Steger for Plaintiff and Respondent.

# INTRODUCTION

Frank Miller is a prominent comic book writer. Several major motion pictures have been adapted from Miller's works, including two based on his Sin City comic book series. Stephen L'Heureux was a producer for one of the Sin City movies.

L'Heureux filed this action against Miller; his company, Frank Miller, Inc.; and the company's chief executive officer, Silenn Thomas (the Miller parties). L'Heureux alleged the Miller parties granted him the rights to adapt Sin City and one of Miller's other comic books, Hard Boiled, for a television series and a film, respectively, but reneged on the agreements and told various people in the entertainment industry—in particular, production studio executives— not to work with L'Heureux because L'Heureux did not have the rights to use Miller's works. L'Heureux asserted causes of action for defamation, interference with contract and with prospective economic advantage, and breach of the implied covenant of good faith and fair dealing.

The Miller parties filed a special motion under Code of Civil Procedure section 425.16 (section 425.16) to strike each of L'Heureux's causes of action and the entire complaint. As relevant to this appeal, they argued their alleged statements about L'Heureux's rights to produce adaptations of Miller's works were protected activity under section 425.16, subdivision (e)(4).

The trial court separately analyzed the Miller parties' statements about whether L'Heureux had rights to Sin City and their statements about whether L'Heureux had rights to Hard Boiled. On the first step of the now-familiar analysis under section 425.16, the court ruled that the Miller parties' statements about L'Heureux's Sin City rights were protected activity, but that their statements about L'Heureux's Hard Boiled rights were

2

not. On the second step, the trial court ruled L'Heureux demonstrated a probability of success on most of his claims based on the Miller parties' statements about his rights to Sin City.

The Miller parties argue the trial court should have ruled on the first step that both their statements about L'Heureux's rights to Hard Boiled, as well as the statements about L'Heureux's rights to Sin City, were protected activity under section 425.16, subdivision (e)(4), while L'Heureux argues the trial court should have ruled neither set of statements was protected activity. We agree with the Miller parties on the first step that they showed the statements about the production of a Sin City television series and a Hard Boiled movie—and in particular, the identity of the producers and others attached to the series and the movie—were matters of public interest and that, by stating to production studios L'Heureux had no rights to use the works, the Miller parties participated in and furthered the discourse, which made the issues ones of public interest. (See *FilmOn.com, Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 151 (*FilmOn.com*).)

On the second step of the analysis under section 425.16, the Miller parties argue the trial court erred in ruling L'Heureux demonstrated a probability of success on his claims based on the Miller parties' statements about L'Heureux's rights to Sin City. We again agree with the Miller parties. L'Heureux attempted to show a probability of success by submitting a declaration describing what a studio executive told him that she had heard from Miller's agent. The executive's statement about what Miller's agent said was hearsay and, contrary to L'Heureux's contention, was not admissible as a statement against interest under Evidence Code section 1230. Because L'Heureux does not argue it is reasonably possible the executive would testify (or her

3

testimony would otherwise be admissible) at trial (see *Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931 (*Sweetwater*)), and in fact argues the opposite, the court erred in admitting the statement. Therefore, we reverse the order denying the motion to strike the claims relating to Sin City.

For the claims based on the Miller parties' statements about L'Heureux's rights to Hard Boiled (for which the trial court did not conduct a step-two analysis), we conclude L'Heureux failed to show a probability of success on his causes of action for defamation, for interference with contract, or for interference with prospective economic advantage. L'Heureux, however, did show a probability of success on his cause of action for breach of the implied covenant of good faith and fair dealing—but only against Miller, not against Frank Miller, Inc. or Thomas. Therefore, we reverse the order with directions to enter a new order granting the motion in part and denying it in part.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Miller Writes Comic Books and Wins Awards*

Miller is a prominent comic book writer. He has won several comic book industry awards, including the Comic-Con International Icon Award.[1] His Sin City comic book series has also received several Comic-Con and other industry awards.

---

[1] The Comic-Con convention has been held annually in San Diego since 1970. "The convention spans several days in length and showcases several hundred events," including "panels of special guests that include science fiction and fantasy authors, film and television actors, directors, producers, and writers.

There have been several major motion pictures and at least one television series based on Miller's works. Miller codirected and cowrote two movies based on the Sin City series: Sin City (Dimension Films 2005) and its sequel, Sin City: A Dame to Kill For (TWC-Dimension 2014). The first Sin City movie earned, among other accolades, a Palme d'Or nomination at the Cannes Film Festival and grossed over $158 million worldwide at the box office. Miller was also an executive producer of the movie 300 (Warner Bros. Pictures 2006), an adaptation of one of his comic book series, which grossed over $456 million worldwide at the box office. Miller was also an executive producer of the television series *Cursed* (Netflix 2020), also based on one of Miller's comic books.

B. *L'Heureux's Company Obtains Rights to Sin City and an Option To Purchase the Rights to Hard Boiled*

L'Heureux is a movie producer. In 2008—between the release of the first and second Sin City movies—L'Heureux's company, Solipsist Films, entered an agreement with Miller to obtain "the specific property currently entitled 'Sin City 2' (A Dame to Kill For)," as well as "the characters, scenes, stories and elements contained therein" and "all ancillary rights therein . . . ." L'Heureux and Solipsist were among the producers of the second Sin City movie.

In 2009 Solipsist entered into an agreement to obtain the option, for a period of 18 months, to purchase all rights, including

[Citation.] In 2016, attendance to San Diego Comic-Con exceeded over 135,000 attendees." (*San Diego Comic Convention v. Dan Farr Productions* (S.D.Cal. 2018) 336 F.Supp.3d 1172, 1177-1178.)

film rights, to Hard Boiled, a comic book series coauthored by Miller and Geoff Darrow.  Miller signed the agreement on behalf of a company called Empire City Inc.

At one point, Frank Miller, Inc. and Solipsist offered The Weinstein Company (TWC) the rights to produce a television series based on Sin City.[2]  However, in 2018 TWC filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware.  (See *In re: TWC Liquidation Trust, LLC* (Bankr.D.Del. filed March 19, 2018, No.18-10601).  Miller and Frank Miller, Inc. filed an objection in the bankruptcy proceeding, and the bankruptcy court entered an order pursuant to a stipulation of the parties stating that "any rights, title or interests in the Sin City Television Series reverted prior to the Petition Date . . . ."

> C.     *L'Heureux Sues the Miller Parties for Obstructing His Efforts To Produce a Sin City Television Series and a Hard Boiled Movie*

In 2020 L'Heureux filed this action against the Miller parties alleging that, while L'Heureux was negotiating agreements with production studios for a Sin City television series and a Hard Boiled movie, the Miller parties falsely stated L'Heureux did not have the rights to produce the series or the movie.  L'Heureux alleged that he had entered an agreement with Legendary Television Productions "for the production of a *Sin City* TV series," but that the Miller parties made "false and defamatory statements" to Legendary and others in the

---

[2]     TWC was also a producer of the second Sin City movie, and TWC-Dimension, one of its subsidiaries, was the United States distributor.

entertainment industry that "L'Heureux has no rights in or to produce Sin City TV." As a result of the Miller parties' statements, L'Heureux claimed, "Legendary made a 'revised offer' to L'Heureux which dramatically reduced [his] compensation" and "his involvement as a producer . . . ." L'Heureux also alleged that, following the stipulation and order in the TWC bankruptcy proceedings, "Miller and his representatives issued press releases [falsely] claiming that all rights in Sin City and Sin City TV had reverted to Miller" (but not to L'Heureux or Solipsist).

Regarding his efforts to produce a movie based on Hard Boiled, L'Heureux alleged that, after Miller initially granted him the option to purchase the rights to Hard Boiled for a limited period, Miller and L'Heureux entered a new option agreement that "extended indefinitely" L'Heureux's option to purchase those rights. L'Heureux alleged he entered into a separate agreement with Miller's coauthor, Darrow, "to develop, package, and produce Hard Boiled."

L'Heureux alleged that eventually he and two of his business partners "brought the [Hard Boiled] movie project to MGM Studios . . . ." According to L'Heureux, however, the Miller parties "made false and defamatory statements" to MGM and others in the entertainment industry that L'Heureux did "not have the right to produce Hard Boiled." L'Heureux also claimed that Miller told MGM that he "would not sign [the] deal unless L'Heureux did not receive a credit" and told MGM to reduce L'Heureux's compensation.

L'Heureux asserted causes of action against the Miller parties for defamation, for falsely claiming L'Heureux did not have the rights to Sin City or Hard Boiled; intentional interference with contract, for disrupting L'Heureux's agreement with Legendary, as well as his partnership agreement with his

business partners and with his separate agreement with Darrow; intentional and negligent interference with prospective economic advantage, for interfering with his prospective deals with Legendary and MGM; and breach of the implied covenant of good faith and fair dealing, for frustrating the purposes of the agreements granting L'Heureux the rights to produce the Sin City and Hard Boiled adaptations.

D.    *The Miller Parties File a Special Motion To Strike*

The Miller parties filed a special motion to strike under section 425.16. As relevant to this appeal, the Miller parties argued their alleged statements about L'Heureux's rights to Sin City and Hard Boiled constituted protected activity under section 425,16, subdivision (e)(4). According to the Miller parties, "the development [and] production of a *Sin City* television series or *Hard[ B]oiled* motion picture are issues of public interest and, indeed, have been widely reported on," and "the alleged defamatory statements supposedly made to studios [and] producers . . . further[ed] the issues of public interest." The Miller parties submitted several articles from entertainment news outlets discussing the possible production of a television series based on Sin City and a movie based on Hard Boiled, including articles about the studios and individuals involved in the productions. Several of the articles specifically mentioned L'Heureux and Solipsist. The Miller parties contended the press releases stating the rights to Sin City had reverted to Miller after the TWC bankruptcy proceeding were also protected under section 425.16, subdivision (e)(4).

### E. *L'Heureux Opposes the Motion*

L'Heureux argued the Miller parties' statements to studio executives and others in the entertainment industry were not protected activity under section 425.16, subdivision (e)(4). Citing *FilmOn.com, supra*, 7 Cal.5th 133, L'Heureux contended the functional relationship between the statements and the public's interest in the production of a television series or movie based on Sin City or Hard Boiled was "tenuous at best" because the Miller parties made the statements "in private conversations to specific individuals, rather than in the course of public discourse."

L'Heureux also argued that, even if the statements were protected activity, he could demonstrate a probability of success on his claims. For the claims based on the Miller parties' statements about L'Heureux's rights to Sin City, L'Heureux submitted an option agreement between Solipsist and Legendary. Under the agreement, Legendary had a three-month option (which Legendary extended multiple times) to purchase from Solipsist the rights to Sin City for $1,000,000. L'Heureux submitted a declaration describing a conversation he had with Natalie Viscuso, an executive with Legendary. According to L'Heureux, Viscuso told him that Miller's agent, Ben Jacobson, told her (Viscuso) that L'Heureux did not have any rights to Sin City and demanded that Legendary reduce L'Heureux's compensation and his role as producer on the series. After the option period ended (and after Jacobson purportedly made the statements to Viscuso), Legendary sent Solipsist a new offer to extend its option. Under the new offer, however, Legendary could exercise its right to purchase the rights to Sin City for $750,000, not $1,000,000.

In support of the claims based on the Miller parties' statements about his rights to Hard Boiled, L'Heureux stated in

9

his declaration that in 2020 he approached the chairman of MGM to produce a Hard Boiled movie and that MGM expressed interest in a deal. L'Heureux also submitted a declaration from Miller's agent, Darren Boghosian, who stated that he told MGM "it was Mr. Miller's understanding that his option with Stephen L'Heureux had expired and therefore Mr. L'Heureux had no rights to the project" and that Miller "would therefore not agree to a deal for his film rights if Mr. L'Heureux received producer or other credit in the film." L'Heureux also submitted deposition testimony from Boghosian,[3] who stated he similarly told L'Heureux's business partners that "the opinion of [Miller's] lawyers was that the option . . . had expired." L'Heureux stated in his declaration he "would have worked and received credit as a producer, with significant compensation for [his] role," had he "finalize[d] a deal with MGM for Hard Boiled."

F. *The Miller Parties Object to L'Heureux's Declaration Describing What Viscuso Told Him*

The Miller parties objected to L'Heureux's description in his declaration of what Viscuso told him about what Jacobson told her, on the ground the statements were inadmissible hearsay. In response to the hearsay objection, L'Heureux argued Viscuso's statement was admissible as a declaration against Viscuso's pecuniary interest under Evidence Code section 1230 (section 1230). L'Heureux stated that Viscuso told him she "feared business repercussions if she voluntarily signed a declaration stating what Mr. Jacobson told her" because she "still

---

[3]     The trial court granted L'Heureux's motion under section 425.16, subdivision (g), to take the Boghosian's deposition on limited topics.

10

works in the entertainment industry" and disclosing what Jacobson told her "could impact her ability to work on projects" with the Miller parties "or those in the industry who are loyal to or under [their] control . . . in the future." L'Heureux argued the statement therefore "threaten[ed] the loss of [Viscuso's] employment, or reduce[d] the chances for future employment." Significantly, L'Heureux did not contend that there was any possibility Viscuso would testify at trial or that he would take her deposition in the United Kingdom and seek to have her testimony admitted at trial.

G. *The Trial Court Denies the Motion on Most of the Claims*

In ruling on the motion, the trial court considered three separate sets of allegations on which L'Heureux's claims were based, two relating to Sin City and one relating to Hard Boiled. The court's grouping of claims was: (1) the Miller parties' statements to Legendary about L'Heureux's rights to Sin City; (2) the Miller parties' alleged press releases stating the rights to Sin City reverted to Miller following the TWC bankruptcy proceeding; and (3) the Miller parties' statements to MGM about L'Heureux's rights to Hard Boiled.

On the first step of the analysis under section 425.16, the court ruled the Miller parties met their burden to show the first two sets of allegations described activity protected under section 425.16, subdivision (e)(4). The court ruled the Miller parties demonstrated "the production of a Sin City television series . . . constitute[d] a matter of public interest" because Sin City was "a critically acclaimed and commercially successful graphic novel and motion picture" and there was "significant public interest and speculation about the production" of the

11

potential television series. The court further ruled the Miller parties, both by making statements to individuals about L'Heureux's rights and by issuing press releases, participated in or furthered the discourse about an issue of public interest.

For the third set of allegations—the Miller parties' statements about L'Heureux's rights to Hard Boiled—the court ruled the Miller parties did not meet their burden to show the statements were protected under section 425.16. The court, however, only considered whether the statements were protected under section 425.16, subdivision (e)(1) and (2), as statements made in connection with anticipated litigation. The court did not consider whether the Miller parties' statements were protected under section 425.16, subdivision (e)(4), even though the Miller parties also moved to strike the allegations on that ground.

On the second step of the analysis, the court ruled L'Heureux met his burden to show a probability of success on most of his causes of action based on the Miller parties' statements to individuals in the entertainment industry about L'Heureux's Sin City rights. The trial court overruled the Miller parties' objection to L'Heureux's statement in his declaration that repeated what Viscuso told him Jacobson told her. The court ruled L'Heureux showed Jacobson's statement to Viscuso that L'Heureux had no rights to Sin City (1) was a false statement that damaged L'Heureux's reputation (defamation); (2) disrupted L'Heureux's agreement and future economic benefit with Legendary (interference with contract and prospective economic advantage); and (3) frustrated the purposes of the agreement granting L'Heureux the rights to Sin City (breach of the implied covenant of good faith and fair dealing). The court ruled, however, L'Heureux did not show Thomas was a party to the contract granting L'Heuruex the Sin City rights or any other

12

contract. Therefore, the court ruled, L'Heureux did not show a probability of success on his cause of action against Thomas for breach of the implied covenant of good faith and fair dealing.

The court did not separately consider whether L'Heureux demonstrated a probability of success on any causes of actions based on the Miller parties' alleged press releases.[4] Ultimately, the court granted the special motion to strike the cause of action for breach of the implied covenant of good faith and fair dealing based on the Miller parties' statements about Sin City, against Thomas only. The court denied the motion on the remaining claims.

## DISCUSSION

A. *Applicable Law and Standard of Review*

"Pursuant to section 425.16, a party may file a special motion to strike a cause of action or particular claims underlying a cause of action that arise from activity protected by [section 425.16]. The moving party 'must establish that the challenged claim arises from activity protected by section 425.16'; if the moving party does so, 'the burden shifts' to the nonmoving party 'to demonstrate the merit of the claim by establishing a

---

[4] Although it is not entirely clear, it appears that in conducting the second step of analysis the court assumed the Miller parties' statements to individuals about L'Heureux's Sin City rights and the Miller parties' press releases gave rise to a single claim, for which L'Heureux could meet his burden by showing a probability of success based on either set of allegations.

13

probability of success.'" (*Olson v. Doe* (2022) 12 Cal.5th 669, 679; see *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.)

Analysis of a special motion to strike under section 425.16 "is not confined to evaluating whether an entire cause of action, as pleaded by the plaintiff, arises from protected activity or has merit. Instead, courts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1010 (*Bonni*); see *Baral v. Schnitt*, *supra*, 1 Cal.5th at pp. 393-395.)

"To succeed in opposing a special motion to strike the nonmoving party must 'demonstrate both that the claim is legally sufficient and that there is sufficient evidence to establish a prima facie case with respect to the claim.'" (*Olson v. Doe, supra*, 12 Cal.5th at p. 679; see *Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.) The Supreme Court has "'described this second step as a "summary-judgment-like procedure." [Citation.] The court does not weigh evidence or resolve conflicting factual claims. . . . It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] "[C]laims with the requisite minimal merit may proceed."'" (*Monster Energy*, at p. 788; see *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 891.)

We review de novo a trial court's order granting or denying a special motion to strike under section 425.16. (*Monster Energy Co. v. Schechter, supra*, 7 Cal.5th at p. 788; *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057,

1067 (*Park*).)  "We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity.  [Citations.]  In addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based."  (*Park*, at p. 1067; see *Li v. Jin* (2022) 83 Cal.App.5th 481, 490.)

B.  *The Trial Court Erred In Denying the Motion To Strike the Allegations About the Press Releases*

The Miller parties first contend the trial court erred by not striking the allegations the Miller parties issued press releases stating the rights to Sin City reverted to Miller following the TWC bankruptcy proceeding.  They argue the trial court correctly ruled the press releases were protected activity under section 425.16, but erred in failing to consider whether L'Heuruex showed a probability of success on any claims arising from the press releases.  The Miller parties also argue L'Heureux did not show a probability of success because he did not submit any evidence of press releases issued by the Miller parties.  (See *Sweetwater*, *supra*, 6 Cal.5th at pp. 940, 679 ["As to the second step inquiry, a plaintiff seeking to demonstrate the merit of the claim 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.'"].)

L'Heureux does not dispute that the press releases were protected under section 425.16 or that he failed to demonstrate a probability of success on any claim based on the press releases.  Instead, L'Heureux contends that none of his causes of action arises "from statements made in press releases" because the press releases only "provided context and background in

15

understanding the history and relationship between the parties." L'Heureux's view of his allegations is incorrect.

Special motions to strike "may only target claims 'arising from'" activity protected under section 425.16. (*Park, supra,* 2 Cal.5th at p. 1062.) A claim does not arise from protected activity when the "activity merely provides evidentiary support or context for the claim." (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 621.) Rather, a "claim arises from protected activity when that activity . . . 'gives rise to [the defendants'] asserted liability . . . .'" (*Park*, at pp. 1062-1063.) To determine what activity gives rise to the defendant's asserted liability, "courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements . . . .'" (*Wilson v. Cable News Network, Inc., supra,* 7 Cal.5th at p. 884; see *Bonni, supra,* 11 Cal.5th at p. 1015.) "If conduct that supplies a necessary element of a claim is protected, the defendant's burden at the first step of the . . . analysis has been carried . . . ." (*Wilson*, at p. 718.)

The Miller parties' press releases did not merely provide background or context; the press releases supplied elements of (at least) his causes of action for defamation, interference with contract, and interference with prospective economic advantage. L'Heureux alleged that the Miller parties "issued false and misleading press releases within the past two years regarding L'Heureux's rights in Sin City and Sin City TV" and that "these press releases were untrue and were made by [the Miller parties] to interfere with L'Heureux's relationship and contractual agreements with Miller [and] Legendary, . . . to damage L'Heureux's reputation in the entertainment industry and to further harm L'Heureux's relationships with other prospective clients and his ability to produce future projects." L'Heureux

16

incorporated these allegations into each of his causes of action. The press releases were some of the allegedly false publications L'Heureux claimed defamed him (see *Taus v. Loftus* (2007) 40 Cal.4th 683, 720 [elements of defamation (include "(a) a publication that is (b) false"])[5] and some of the acts that interfered with his contracts and economic relationships (see *Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1141 [element of intentional interference with contract is "'intentional acts designed to induce a breach or disruption of the contractual relationship'"]; *Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 512 [element of intentional inference with prospective economic advantage is "intentionally wrongful acts designed to disrupt the [economic] relationship"].) L'Heureux similarly alleged, in support of his negligent interference with prospective economic advantage cause of action,

---

[5]   Although the press releases may not have been defamatory on their face, L'Heureux claimed they had a meaning or "innuendo" that made them defamatory.  (See *Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645; see also *Washer v. Bank of America Nat. Trust & Savings Assn.* (1943) 21 Cal.2d 822, 828 ["[t]he office of an innuendo is to declare what the words meant to those to whom they were published," and an "innuendo . . . is necessary where the words used are susceptible of either a defamatory or an innocent interpretation"], disapproved on another ground in *MacLeod v. Tribune Pub. Co.* (1959) 52 Cal.2d 536, 551; *Bartholomew v. YouTube, LLC* (2017) 17 Cal.App.5th 1217, 1226-1227 ["if the reader would be able to recognize a defamatory meaning only by virtue of his or her knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons, then . . . the libel cannot be libel per se but will be libel *per quod*"].)

17

the Miller parties "committed wrongful acts, including but not limited to . . . issuing the press releases alleged herein, which acts disrupted L'Heureux's economic relationship under the existing agreements as alleged . . . ."

Because L'Heureux alleged the Miller parties' liability arose from the press releases, he cannot now reframe the allegations as simply contextual background. If L'Heureux "wishes to abandon" his claims based on the press releases, "he may seek to do so in an appropriate forum. But for present purposes, we will assume his complaint means what it says." (*Bonni, supra*, 11 Cal.5th at p. 1017; see *JKC3H8 v. Colton* (2013) 221 Cal.App.4th 468, 477-478 [plaintiff "may not seek to subvert or avoid a ruling" a ruling on a special motion to strike under section 425.16 "by amending the challenged complaint . . . in response to the motion].) Because L'Heureux did not submit any evidence showing the Miller parties issued any press releases, let alone defamatory ones, the trial court erred in denying the special motion to strike these allegations.

C. *The Statements About L'Heureux's Sin City and Hard Boiled Rights Were Protected Activity Under Subdivision (e)(4)*

Section 425.16 defines four categories of protected activity. (See § 425.16, subd. (e).) Section 425.16, subdivision (e)(4), commonly referred to as the "catchall provision" (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1243 (*Geiser*), protects "conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue or an issue of public interest." As the Supreme Court explained in *FilmOn.com, supra*, 7 Cal.5th 133, the "inquiry under the catchall provision . . . calls for a two-part analysis . . . ." (*Id.* at p. 149; see *Geiser*, at

p. 1249.)  "[W]e first 'ask what "public issue or [ ] issue of public interest"' is implicated by the challenged activity.  [Citation.]  Second, we look to the 'functional relationship' between the challenged activity and the 'public conversation' about that issue, and ask whether the activity '"contribute[s]"' to public discussion of the issue."  (*Geiser*, at p. 1250; see *FilmOn.com*, at pp. 149-150.)  "'[I]it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute'" to the public discussion of the issue.  (*FilmOn.com*, *supra*, 7 Cal.5th at p. 150; see *Bishop v. The Bishop's School* (2022) 86 Cal.App.5th 893, 905 (*Bishop*).)

### 1.     *The Statements Implicated an Issue of Public Interest*

The Miller parties contend the trial court correctly ruled the production of a Sin City television series was an issue of public interest, but erred in ruling the production of a Hard Boiled movie was not an issue of public interest.  They are right on both contentions.

"In articulating what constitutes a matter of public interest, courts look to certain specific considerations, such as whether the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the direct participants' [citation]; and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation], or 'affect[ed] a community in a manner similar to that of a governmental entity.'"  (*Filmon.com, Inc.*, *supra*, 7 Cal.5th at pp. 145-146; see *Bishop*, *supra*, 86 Cal.App.5th at p. 905.)  The "first step is satisfied so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public

19

issue, even if it also implicates a private dispute. Only when an expressive activity, viewed in context, cannot reasonably be understood as implicating a public issue does" a special motion to strike under section 425.16 fail at the first step of the *FilmOn.com* analysis. (*Geiser*, *supra*, 13 Cal.5th at pp. 1253-1254.)

The production of both a Sin City series and Hard Boiled movie can reasonably be understood to implicate public issues. The Miller parties demonstrated Miller was a person in the public eye—at least in the comic book and entertainment industries. He and his comic books won multiple industry awards. Miller's works have been adapted into major motion pictures and a television series that reached wide audiences, and Miller was a director or producer of several of the productions.

The production of either the series or the movie would also affect a large number of people. Both the Hard Boiled comic book series and the Sin City comic book series generated significant interest in the comic book and entertainment industries. Miller and Darrow won a Comic-Con Eisner Award for Hard Boiled, and Miller won multiple Eisner Awards and Harvey Awards for several of the comic book issues in the Sin City series. Sin City was also adapted into two major motion pictures codirected by Miller, one of which was commercially successful. And the studios interested in obtaining the rights to the television series and movie, Legendary and MGM, produce major motion pictures that reach wide audiences.

Finally, the Miller parties demonstrated that several entertainment media publications and websites had reported, on several occasions, on the production of both a Sin City television series and a Hard Boiled movie. (See *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143 ["the creation

and broadcasting" of an episode for a popular television show was "an issue of public interest because the public was demonstrably interested in the creation and broadcasting of that episode"].) Several digital and print magazines and news websites reported that Miller regained the rights to produce a Sin City television series from TWC following the TWC bankruptcy proceeding. Multiple entertainment and cable television websites reported on a potential deal for Legendary to produce the series. Several media outlets and film industry websites also reported that Miller was working on a movie adaptation of Hard Boiled and that (before MGM) Warner Bros. was trying to acquire the rights to produce the movie.

### 2. *The Statements Contributed to the Public Discussion of the Issues of Public Interest*

The closer question is whether the Miller parties' statements to Legendary, MGM, and others that L'Heureux had no rights to Hard Boiled or Sin City satisfied the second step of the *FilmOn.com* analysis; that is, whether the statements contributed to public discussion of the issues of public interest. In the circumstances of this case, they did.

As the Supreme Court explained in *Filmon.com, supra*, 7 Cal.5th 133: "What it means" to contribute to public discussion "will perhaps differ based on the state of public discourse at a given time, and the topic of contention. But ultimately, our inquiry does not turn on a normative evaluation of the substance of the speech. We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes

21

an issue one of public interest." (*Id.* at pp. 150-151.) "In conducting this inquiry, we 'must consider the particular context of the speech, including the speaker's identity; the "purpose" of the speech; the nature of the audience and the intended audience; and the "timing" and "location" of the communication.'" (*Bishop*, *supra*, 86 Cal.App.5th at p. 906; see *Murray v. Tran* (2020) 55 Cal.App.5th 10, 30.)

*Filmon.com, supra,* 7 Cal.5th 133, for example, involved a dispute between a company that provided internet-based entertainment content (FilmOn) and a company that collected information about websites for its clients to use for targeted advertisements (DoubleVerify). (*Id.* at p. 141.) FilmOn sued DoubleVerify after DoubleVerify sent confidential reports to its clients classifying some material on FilmOn's websites as "Adult Content" and "Copyright Infringement." (*Id.* at pp. 141-142.) The Supreme Court held that, although the presence of adult content and copyright-infringing material on the internet generally may have been issues of public interest, DoubleVerify's reports did not constitute protected activity under section 425.16, subdivision (e)(4), because they did not further the public's conversation about those issues. The Supreme Court explained that "DoubleVerify issue[d] its reports not to the wider public . . . but privately, to a coterie of paying clients. Those clients, in turn, use the information DoubleVerify provides for their business purposes alone. The information never entered the public sphere, and the parties never intended it to." (*Filmon.com*, at pp. 153-154.)

L'Heureux focuses on the fact that the Miller parties made the statements that L'Heureux had no rights to Sin City or Hard Boiled to "a private network of individuals" as part of a "business dispute" involving "Hollywood insiders," not to the public at

large.  That the defendant communicated the challenged statements privately "makes heavier [the defendant's] burden of showing that, notwithstanding the private context, the alleged statements nevertheless contributed to discussion or resolution of a public issue for purposes of subdivision (e)(4)."  (*Wilson v. Cable News Network, supra*, 7 Cal.5th at p. 903; see *Musero v. Creative Arts Agency, LLC* (2021) 72 Cal.App.5th 802, 821.)  And, like the reports in *FilmOn.com.*, the Miller parties' statements at least partially served business purposes—the Miller parties made the statements during negotiations with Legendary and MGM.

Other contextual factors, however, show that this is one of those circumstances where, notwithstanding the private nature of the statements, the Miller parties "participated in, or furthered, the discourse" (*FilmOn.com*, *supra*, 7 Cal.5th at p. 151) that made the production of a Sin City television series or a Hard Boiled movie one of public interest.  This is not a situation where the defendant is offering  "a 'synecdoche theory' of public interest" under section 425.16 by "defining [a] narrow dispute by its slight reference to [a] broader public issue."  (*Id.* at p. 153; see *Wilson v. Cable News Network*, *supra*, 7 Cal.5th at p. 902.)  The Miller parties showed not only that there was public interest in the production of movies and television shows generally, or even in Miller and his works generally, but also that there was public interest specifically in the production of both a Sin City television series and Hard Boiled movie.  (See *Geiser v. Kuhns, supra*, 13 Cal.5th at p. 1250 [determination of the public interest implicated by the statements "operates as a lens that focuses the analysis at the second step"].)

Moreover, the Miller parties showed there was public interest in which studios and which specific individuals were working on a Sin City television series and a Hard Boiled movie,

23

including in the involvement of L'Heureux and Solipsist in the projects.  For example, the Miller parties submitted a 2013 article from an entertainment news publication discussing a potential Hard Boiled movie that stated L'Heureux and Solipsist were among the collaborators.  The Miller parties also submitted two 2016 articles from an entertainment news outlet stating that Warner Bros. was trying to produce the movie and that the movie would be a coproduction with Solipsist and L'Heureux, among others.  The Miller parties submitted a 2017 article from an entertainment news media publication stating that TWC-Dimension was developing a Sin City television series and that L'Heureux would be a producer.  And the Miller parties submitted a 2019 article discussing the agreement for Legendary to produce the television series, which stated L'Heureux would be an executive producer with Miller.  Each article mentioned L'Heureux's prior production of the second Sin City movie.

The Miller parties' statements that L'Heureux had no rights to produce the television series and the movie thus had a close connection to the specific issue in which the public was interested.  That distinguishes this case from *FilmOn.com* and other cases where courts have held the statements were only marginally related to issues of public interest.  (Cf. *FilmOn.com*, *supra*, 7 Cal.5th at p. 153 ["[t]hat DoubleVerify identifies FilmOn as falling within certain categories . . . tells us nothing of how that identification relates to the issues of copyright and adult content"]; *Musero v. Creative Artists Agency, LLC*, *supra*, 72 Cal.App.5th at p. 821 [while "a proposed television series . . . based on the life of former Attorney General Holder . . . would be a topic of widespread public interest," private discussions between writer and talent agents "[c]ommunicating the general idea of a legal drama . . . involving the Attorney General and

24

prosecutors in the Department of Justice" were not protected activity because they were "not closely linked to any ongoing public interest that might exist with respect to former Attorney General Holder"]; *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280-1281 [although a documentary film "address[ed] topics of widespread public interest," alleged misuse of plaintiff's persona in the film was not protected because there was "no discernable public interest in [plaintiff's] persona"].)

Finally, the identity of the speakers, the purpose of the statements, and the nature of the audience (see *Bishop, supra,* 86 Cal.App.5th at p. 906) all showed the Miller parties participated in the discourse that made the issues of public interest. The people who stated L'Heureux had no rights to Sin City or Hard Boiled were not random people. They were agents of Miller, the creator of the works. One would expect comments from a prominent creator about adaptations of his (also prominent) works to generate public interest. The audiences were major motion picture studios interested in producing adaptations for a wide audience. And at least one purpose of the statements was to prevent L'Heureux and Solipsist from influencing the creation of the movie or the television series that would ultimately reach the public. By making statements about whom they wanted involved in the production, the Miller parties participated in the developments of a potential movie and television series that had already generated public interest and that, if produced, would be topics of public discussion. (See *Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027, 1043 [producers' "discussions to make a feature documentary film" were in connection with an issue of public interest, even though the film had not been completed, because "the proposed documentary was speech activity intended for 'the

public sphere'" [citation] and defendants' work thereon constituted an "attempt to participate in a larger public discussion"].)

        D.     *L'Heureux Failed To Show a Probability of Success on His Claims Based on the Miller Parties' Statements About L'Heureux's Rights to Sin City*

L'Heureux submitted only one piece of evidence to show the Miller parties made statements about his rights to Sin City: L'Heureux's statement in his declaration that Viscuso, an executive at Legendary, told him that Miller's agent, Jacobson, told her that Miller had no rights and demanded Legendary reduce L'Heureux's compensation. The Miller parties contend the trial court erred in overruling their hearsay objection to this statement.[6]

In *Sweetwater, supra,* 6 Cal.5th 931 the Supreme Court addressed what evidence is admissible for purposes of determining whether a plaintiff has shown a probability of

---

[6] The Miller parties describe the statement as "triple hearsay," presumably because it was (1) L'Heureux's statement in his declaration (2) about what Viscuso told him (3) about what Jacobson told her. The description is not accurate. The first level is L'Heureux's declaration; that's admissible. (See § 425.16, subd. (b)(2) [in ruling on special motion to strike, "the court shall consider . . . affidavits stating the facts upon which the liability . . . is based"].) The third level is not hearsay. L'Heureux did not offer Jacobson's purported statement to Viscuso for the truth of what Jacobson stated. (See Evid. Code, § 1200.) L'Heureux offered the statement to show *what* Jacobson said about L'Heureux (and indeed, intends to prove what he said was false). It is only the second level—what Viscuso told L'Heureux—that is potentially inadmissible hearsay.

26

success.  The Supreme Court distinguished "between evidence that *may* be admissible at trial and evidence that could *never* be admitted."  (*Id.* at p. 948.)  The Supreme Court explained that courts "may consider affidavits, declarations, and their equivalents if it is reasonably possible the proffered evidence set out in those statements will be admissible at trial.  Conversely, if the evidence relied upon *cannot* be admitted at trial, because it is categorically barred or undisputed factual circumstances show inadmissibility, the court may not consider it in the face of an objection.  If an evidentiary objection is made, the plaintiff may attempt to cure the asserted defect or demonstrate the defect is curable."  (*Id.* at p. 949; see *Musero v. Creative Arts Agency, LLC*, *supra*, 72 Cal.App.5th at p. 816, fn. 6; *Harris v. Thomas Dee Engineering Co.* (2021) 68 Cal.App.5th 594, 603.)

In response to the Miller parties' hearsay objection, L'Heureux did not argue the trial court could consider Viscuso's statement because it was reasonably possible that Viscuso would testify at trial or that he would go to Europe, take her deposition, and present her deposition testimony.  (Cf. *Sweetwater, supra*, 6 Cal.5th at p. 949 [trial court may consider statements in grand jury testimony and plea forms because the "signers of those documents or other competent witnesses could testify at trial" and "[t]hat live testimony would supplant any improper reliance on hearsay"].)  Nor does L'Heureux argue on appeal the hearsay defect is curable because Viscuso may eventually testify.  To the contrary, L'Heureux maintains that Viscuso, who lives in the United Kingdom, is unavailable to testify at trial (because she is beyond the court's subpoena power) and that she is unwilling to repeat the statement she made to L'Heureux because she fears business repercussions.  As he did in the trial court, L'Heureux argues only that the court may consider Viscuso's statement to

27

him because it is admissible as a declaration against interest under section 1230.

We generally review the trial court's evidentiary rulings on a special motion to strike under section 425.16 for abuse of discretion (*Winslett v. 1811 27th Avenue, LLC* (2018) 26 Cal.App.5th 239, 246; *Klem v. Access Ins. Co.* (2017) 17 Cal.App.5th 595, 606), including whether a statement is admissible under section 1230 (*People v. McDaniel* (2021) 12 Cal.5th 97, 132; *People v. Grimes* (2016) 1 Cal.5th 698, 711). "Whether a trial court has correctly construed section 1230 is, however, a question of law that we review de novo." (*Grimes*, at p. 712.)

Section 1230 provides: "[E]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." L'Heureux contends that Viscuso, by telling him what Jacobson told her, "put [her] pecuniary and financial interests at risk" by "jeopardiz[ing] her ability to work with [the Miller parties] and those loyal" to Miller. The Miller parties argue that, for the exception to apply, "it is not sufficient that the mere making of the statement" was against the declarant's interest because of the circumstances; rather, the "facts contained in the statement" must be against the declarant's interest as well. According to the Miller parties, that Jacobson said Miller

28

had no rights to Sin City was not against Viscuso's interest.  The Miller parties have the better argument, and the trial court erred in overruling their hearsay objection.

In *In re Weber* (1974) 11 Cal.3d 703 (*Weber*) the petitioner in a habeas proceeding sought to introduce an out-of-court statement from another inmate who was unavailable to testify. The inmate stated his cellmate told him that he (the cellmate) framed the petitioner by giving perjured testimony during the petitioner's trial.  (*Id.* at pp. 711, 721.)  The petitioner argued the inmate's statement about what his cellmate said was admissible under section 1230 as a statement that created a risk of making the declarant an object of hatred, ridicule, or social disgrace in the community.  (*Weber*, at p. 721.)  According to the petitioner, by making the statement the inmate "became a 'snitch' within the prison community" and therefore "'assumed the risk of the ultimate sanction'" (presumably death).  (*Ibid*.)  The Supreme Court held that the statement was not admissible under section 1230.  The Supreme Court explained that, "in order for a declaration to be against the declarant's social interest to such an extent that it becomes admissible under section 1230 of the Evidence Code, both the content of the statement and the fact that the statement was made must be against the declarant's social interest."  (*Weber*, at p. 722.)

A similar analysis applies here.  L'Heuruex is essentially arguing that, if Viscuso were to disclose what Jacobson told her, she would risk future business opportunities because she would have "broke[n] a confidence" and "betray[ed] the trust placed in [her]" by Miller and his agents, causing Miller and others to refuse to work with her.  However, the "content of the statement"—that Jacobson said L'Heureux had no rights in Sin City—was not contrary to Viscuso's pecuniary interest.

29

Therefore, under *Weber* the hearsay exception in section 1230 does not apply.

L'Heureux contends the rule in *Weber* is limited to the exception under section 1230 for a statement against social interest. Although the Supreme Court in *Weber* specifically analyzed the exception under section 1230 for a statement against social interest, there is no principled reason not to apply the same reasoning to the exception under section 1230 for a statement against pecuniary interest—at least where the purported reason the statement is against the declarant's interest is because the declarant risks consequences of breaking confidences. As the Supreme Court explained, if section 1230 were not limited to situations where the content of the statement was against the declarant's social interest, "each time a witness broke a confidence, he could claim that . . . by betraying the trust placed in him, he had incurred social opprobrium." (*Weber*, *supra*, 11 Cal.3d at p. 722.) Similarly, under L'Heureux's theory, each time a witness (like Viscuso) broke a confidence with any person who worked in the same industry as the witness, the person seeking to introduce the statement could claim the witness risked losing future business opportunities. Indeed, the risk the witness faced in *Weber* by betraying his former cellmate's confidences (death or bodily injury by the cellmate or the cellmate's "immediate friends" (*Weber*, at p. 722) in prison) was far greater than the remote risk Viscuso faced by telling L'Heureux about the statements by Miller's agent (losing the possibility of working with Miller in the future).

In addition, in holding that both the content of the statement and the fact the statement was made must be against the declarant's social interest, the Supreme Court cited the following rule from Wigmore's treatise: "'It must be remembered

that it is not merely the statement that must be against interest, but the Fact stated. It is because the fact is against interest that the open and deliberate mention of it is likely to be true.'" (*Weber, supra*, 11 Cal.3d at p. 722, citing Wigmore, Evidence (3d ed. 1940) § 1462, p. 26.) Wigmore did not limit the rule to the exception for statements against social interest. Rather, Wigmore labeled the hearsay exception analogous to section 1230 as "statement of facts against interest" and explained the "basis of the exception is the principle of experience that a statement asserting a fact distinctly against one's interest is unlikely to be deliberately false or heedlessly incorrect . . . ." (5 Wigmore, Evidence (Chadbourn ed. 1972) §§ 1455, 1458, pp. 324-325; 329-330; see *People v. Johnson* (1974) 39 Cal.App.3d 749, 761; *People v. Traylor* (1972) 23 Cal.App.3d 323, 331; see also *State v. Fredette* (Me. 1983) 462 A.2d 17, 22 [citing *Weber* and Wigmore's treatise for the proposition that "[i]t is irrelevant whether the statement of fact could tend to create liability; it is the *fact* stated which must be against interest"].)

Finally, even if section 1230 extended to some circumstances where the fact the declarant made a statement, but not the facts in the statement, was against the declarant's pecuniary interest, the trial court abused its discretion in overruling the Miller parties' objection here. Under section 1230 an out-of-court statement is admissible only "if the statement, when made, was so far against the declarant's interests, penal or otherwise, that a reasonable person would not have made the statement unless he or she believed it to be true.' [Citation.] The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration." (*People v. McDaniel, supra*, 12 Cal.5th at p. 132; see *People v. Westerfield* (2019) 6 Cal.5th 632, 704.) Even under L'Heureux's

31

understanding of section 1230, the potential adverse consequences to Viscuso of making the statement were too remote and speculative, and the statement lacked sufficient indicia of trustworthiness, to make it admissible.

The parties cite little authority addressing the exception for statements against pecuniary interest. The exception traditionally applies when the declarant admits a debt. (See, e.g., *Dodd v. Cantwell* (1960) 179 Cal.App.2d 727, 729, 732 [ranch owner's statement to ranch hands that she would pay their back wages after selling the ranch was an admission of a debt and therefore a declaration against interest]; *Newby v. Gibson* (1935) 6 Cal.App.2d 359 [declarant's admissions that he owed an individual $10,000 and that he instructed his attorney to carry out a settlement agreement resolving the debt was an admission against pecuniary interest]; Wegner et al., Cal. Practice Guide: Civil Trials & Evidence (The Rutter Group 2022) ¶ 8:1299 [a "statement is against the declarant's *pecuniary* . . . interest if it acknowledges a detrimental change in the declarant's position regarding a *debt*"].) In *Cheal v. El Camino Hospital* (2014) 223 Cal.App.4th 736 (*Cheal*) the court applied the exception to an admission that jeopardized a person's employment. There, a hospital supervisor told her friend "that she favored younger and pregnant workers, and that she was concerned about this treatment being noticed." (*Id.* at pp. 755, 757.) The court stated a "supervisor's statement that she 'favors' one class of employees, potentially at the expense of a protected class, creates a . . . risk of future economic loss" because, "if publicly known, it would expose her employer to liability and jeopardize her own present and future employment." (*Id.* at p. 757; see *Gichner v. Antonio Troiano Tile & Marble Co.* (D.C.Cir. 1969) 410 F.2d 238, 242 [a "statement is against pecuniary and proprietary interest when

32

it threatens the loss of employment, or reduces the chances for future employment"].)

L'Heureux contends Viscuso's statement about what Jacobson told her similarly reduced her chance for future employment. The risk that Viscuso's statement would affect her future employment, however, was too remote for the exception to apply. In *Cheal* the supervisor directly admitted to wrongdoing that, if known, could cause her employer to terminate her employment and would likely deter future employers from hiring her. In contrast, Viscuso did not admit to any wrongdoing. She merely expressed concern that, if she signed a declaration attesting to what Jacobson told her, it "*could* impact her ability to work on projects" (italics added) with Miller or others close to him in the future. Moreover, there is no reason to believe Viscuso is ever likely to work with Miller in the future. According to L'Heureux's evidence, Viscuso no longer works at Legendary, the studio that once negotiated with Miller to produce a Sin City television series. There is no evidence Viscuso has an independent relationship with Miller. And while L'Heureux stated in his declaration Viscuso still works in the "entertainment industry," there is no evidence what her current position is or that she works at a company that might do business with Miller in the future. (Cf. *People v. Chhoun* (2021) 11 Cal.5th 1, 48 ["potential consequences" of an inmate's belated admissions about his crime on his chance for parole or on a motion for new trial "were too speculative or remote to impinge on penal interest" for purposes of section 1230].)

In addition, Viscuso's statement to L'Heureux about what Jacobson purportedly told her did not evidence the same level of trustworthiness the supervisor's statement in *Cheal* did. In *Cheal* the supervisor made the statement to her friend. As the

33

court in *Cheal* observed, courts generally find "a strong assurance of trustworthiness in the circumstance that a statement was made in a "'conversation . . . between friends in a noncoercive setting that fosters uninhibited disclosures.'"" (*Cheal, supra,* 223 Cal.App.4th at p. 760; see *People v. Tran* (2013) 215 Cal.App.4th 1207, 1217.) The court in *Cheal* also stated "the statement's evident purpose . . . was to enlist [the friend's] cooperation in concealing" her favoritism, which suggested the supervisor "was conscious of the damaging potential her favoritism, if established, could have." (*Cheal,* at p. 760.) Here, Viscuso made the statement to L'Heureux either while Legendary was negotiating with L'Heureux and Miller for a valuable production deal or after the deal had fallen through.[7] Discussions between parties on opposite ends of potential business deal do not foster the same uninhibited disclosures as conversations between friends. Nor was there any evidence about why Viscuso made the statement to L'Heureux, and thus whether she may have an incentive to be less than forthcoming or withhold details of her conversation with Jacobson.

Therefore, the trial court abused its discretion in admitting Viscuso's statement over the Miller parties' hearsay objection. Because L'Heureux did not submit any other evidence to show the Miller parties made statements about his Sin City rights, L'Heureux did not show a probability of success on the claims arising from those statements.

---

[7]     L'Heureux does not state when Viscuso told him about the conversation.

34

E.    *L'Heureux Showed a Probability of Success on Some but Not All of His Claims Arising from the Miller Parties' Statements About His Rights to Hard Boiled*

1.    *L'Heureux Did Not Show a Probability of Success on His Cause of Action for Defamation*

a.    *Applicable Law*

The elements of defamation are "'"(a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage."'" (*Taus v. Loftus*, *supra*, 40 Cal.4th at p. 720; accord, *Bishop*, *supra*, 86 Cal.App.5th at p. 909.)  To show the Miller parties made a false publication, L'Heureux relied on the statement by Miller's agent Boghosian to MGM that "it was Mr. Miller's understanding that [the] option with Stephen L'Heureux had expired and therefore that Mr. L'Heureux had no rights" to produce a movie based on Hard Boiled.  The Miller parties argue the statement was an opinion about an unsettled legal dispute, which is not a provably false assertion of fact.

"'Because [a defamatory] statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability.'" (*Dickinson v. Cosby* (2019) 37 Cal.App.5th 1138, 1163; see *Taus v. Loftus*, *supra*, 40 Cal.4th at p. 720; *Bishop*, *supra,* 86 Cal.App.5th at p. 909.)  "Statements of opinion, however, do not enjoy blanket protection.  [Citation.]  Rather, 'a statement that implies a false assertion of fact, even if couched as an opinion, can be actionable.'  [Citation.]  The dispositive question is not whether a statement is fact or opinion, but 'whether a reasonable fact finder could conclude the published statement declares or implies a provably

false assertion of fact.'"  (*Dickinson*, at p. 1163; see *ZL Technologies, Inc. v. Does 1-7* (2017) 13 Cal.App.5th 603, 624; *Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 427.)  The same analysis applies to legal conclusions.  (See *Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 527; *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1471 (*Ruiz*).)

'"We apply a '"totality of the circumstances"' test to determine . . . whether a statement declares or implies a provably false factual assertion; that is, courts look to the words of the statement itself and the context in which the statement was made.'  [Citation.]  Under this test, '"[f]irst, the language of the statement is examined.  For words to be defamatory, they must be understood in a defamatory sense . . . .  [¶]  Next, the context in which the statement was made must be considered."'"  (*Balla v. Hall* (2021) 59 Cal.App.5th 652 ,678; see *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260-261; *Dickinson v. Cosby, supra*, 37 Cal.App.5th at p. 1163.)  "Whether a statement declares or implies a provably false assertion of fact is generally a question of law to be decided by a court."  (*Bishop*, *supra*, 86 Cal.App.5th at p. 910; see *Balla*, at p. 678; *Issa v. Applegate* (2019) 31 Cal.App.5th 698 ,703.)

b.      *L'Heuruex Did Not Show Boghosian's Statement Implied False Facts*

Boghosian qualified his statement to MGM about L'Heureux's rights by stating it was Miller's "understanding" that L'Heureux's option to produce a Hard Boiled movie had "expired."  That Boghosian qualified his statement as Miller's "understanding" suggests Boghosian was expressing an opinion based on a potentially unsettled set of facts.  (See *Baker v.*

*Los Angeles Herald Examiner*, *supra*, 42 Cal.3d at pp. 261-262 ["When one states a view in terms of an 'impression,' the listener or reader is on notice that the maker is not vouching for its accuracy. A reasonable person would understand that a statement of opinion rather than of fact was to follow."].)

That, however, is not the end of the analysis. There is no evidence in the record Boghosian explained to anyone at MGM with whom he spoke the basis for Miller's opinion L'Heureux's rights had expired. Where "'an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant,'" the opinion may still "'give[ ] rise to the inference that there are undisclosed facts that justify the forming of the opinion . . . .'" (*John Doe 2 v. Superior Court* (2016) 1 Cal.App.5th 1300, 1314.) "'[A]n opinion based on implied, undisclosed facts is actionable if the speaker has no factual basis for the opinion.'" (*Bently Reserve LP v. Papaliolios*, *supra*, 218 Cal.App.4th at p. 429; see *Ruiz*, *supra*, 134 Cal.App.4th at p. 1471 [same]; Rest.2d Torts, § 566, com. (c)(4) ["If the defendant expresses a derogatory opinion without disclosing the facts on which it is based, he is subject to liability if the comment creates the reasonable inference that the opinion is justified by the existence of unexpressed defamatory facts."].)

Boghosian stated that L'Heureux's option rights had expired, presumably during discussions with MGM about whether to produce the movie; according to Boghosian, the purpose of the statement was to prevent L'Heureux from receiving any production credit and to see if there was a way to "get [the production] moving. There is no indication, for example, Boghosian made the statement during an impassioned "rant" or "diatribe" (*Bently Reserve LP v. Papaliolios*, *supra*,

218 Cal.App.4th at p. 433) or intended the statement as hyperbole (see *Baker v. Los Angeles Herald Examiner*, *supra*, 42 Cal.3d at p. 267 [statements "'being used in a metaphorical, exaggerated or . . . fantastic sense' . . . did not imply the existence of any undisclosed facts"]). Therefore, a jury could reasonably find Boghosian's statement implied Miller was aware of specific, undisclosed facts supporting his understanding that L'Heureux's rights had expired. (See *Ruiz*, *supra*, 134 Cal.App.4th at p. 1472 ["statements that [a lawyer] acted unconscionably and in violation of his ethical duties as a lawyer [were] not mere hyperbole, epithet, or 'subjective expressions of disapproval, devoid of any factual content'"].)

The problem for L'Heureux, however, is that he did not submit evidence showing the facts implied by Boghosian's statement were false—i.e., that there was no factual basis for Miller's opinion. For example, had Miller signed an agreement unambiguously granting L'Heuruex the option to purchase the rights during the time he was negotiating with MGM, Miller's statement may have had no factual basis. The evidence submitted by the parties, however, was to the contrary. The latest written option agreement between Solipsist and Miller's company, Empire City, Inc., was from 2009. The agreement gave Solipsist 18 months to acquire the rights to Hard Boiled and the ability to extend the option term an additional 18 months. Boghosian's discussions with MGM were in 2020, well after the option term described in the written agreement expired. And while L'Heureux stated in his declaration that Miller orally agreed to extend the option rights indefinitely, counsel for Miller sent counsel for L'Heureux a letter in 2018—prior to Boghosian's discussions with MGM—stating the Miller parties' position that any oral agreement to extend the agreement was invalid under

38

the Copyright Act of 1976 (see 17 U.S.C § 204) (an issue we will discuss shortly). (See *Integrated Healthcare Holdings, Inc. v. Fitzgibbons*, *supra*, 140 Cal.App.4th at p. 529 [even if the court were to construe an individual's assertion that the company was "going bankrupt" as "implying undisclosed facts, it would still not constitute actionable libel because [the company] failed to provide competent evidence that it was not headed toward bankruptcy at the time [the individual] sent his email"]; *Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1021 [while statements that one plaintiff was a "deadbeat dad" and the other was "bankrupt, drunk, and '[c]hewin' tobaccy'" were "*capable* of conveying a provably false factual imputation," the plaintiffs did not show a probability of success "because they failed to make a prima facie showing that the statements were substantially false"].)

L'Heureux's primary arguments for why Boghosian's statement was a false assertion of fact are that the Miller parties are wrong about the Copyright Act and that whether L'Heureux had the rights to Hard Boiled ultimately depended on "facts regarding Miller's unavailability during the option period and his oral agreements to extend the option." True enough: The resolution of most legal disputes in some way depends on applying law to facts. But for L'Heureux to prove defamation, it is not enough to show Miller's "understanding" that L'Heureux's legal rights expired was, as a matter of law, incorrect. (See *Coastal Abstract Service, Inc. v. First American Title Ins. Co.* (9th Cir. 1999) 173 F.3d. 725, 731 ["Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact."]; see also *Savage v. Pacific Gas & Electric Co.* (1993) 21 Cal.App.4th 434, 445 [A statement that a

39

journalist had a conflict of interest was not actionable because "[t]he determination of a conflict of interest involves . . . an application of an ethical standard to facts, reflecting the exercise of judgment. The judgment may, of course, be reasonable or unreasonable; but whatever quality may be attributed to it, the expressed belief in the existence of a conflict of interest . . . [cannot] be proved to be true or false."].) L'Heureux had to show Miller's conclusion implied facts that were false—i.e., that Miller had no factual basis for his conclusion. (See *Hughes v. Hughes* (2004) 122 Cal.App.4th 931, 937 [if an "unfavorable comment implies the existence of facts that justify the terms in which [the speaker] has described the person of whom he spoke, it is the truth of these facts that is to be determined"]; Rest.2d Torts, § 566, com. (f) ["In the case of a derogatory comment implying the existence of undisclosed facts that justify the opinion, it is the truth or falsity of these facts that is in issue."].) L'Heureux did not do that. (See *Integrated Healthcare Holdings v. Fitzgibbons*, *supra*, 140 Cal.App.4th at p. 529 [in evaluating whether a plaintiff met his burden of showing a probability of success in opposition to a special motion to strike under section 425.16, courts "will not engage in a leap of faith that, despite [the plaintiff's] inadequate evidentiary showing in opposition," the plaintiff "will present substantial evidence supporting its defamation claim"].)

> 2. *L'Heureux Did Not Show a Probability of Success on His Causes of Action for Interference with Prospective Economic Advantage*

A "plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful 'by some

measure beyond the fact of the interference itself.'" (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392-393; see *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1158; *Redfearn v. Trader Joe's Co.* (2018) 20 Cal.App.5th 989, 1005.) "'[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.'" (*Ixchel Pharma, LLC v. Biogen, Inc.*, *supra*, 9 Cal.5th at p. 1142; see *Korea Supply Co.*, at p. 1159; *Redfearn*, at p. 1006.)

Like for his defamation claim, L'Heureux relied on Boghosian's statement to MGM that L'Heureux's option rights had expired to show the Miller parties interfered with his economic relationship with MGM. He contends the statement was independently wrongful because it was defamatory. L'Heureux does not offer any other ground for why the statement was independently wrongful. As discussed, however, Boghosian's statement was not defamatory. Therefore, L'Heureux failed to show a probability of success on these causes of action.

### 3. *L'Heureux Did Not Show a Probability of Success on His Cause of Action for Interference with Contract*

Interference with contractual relations requires "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." (*Ixchel Pharma, LLC v. Biogen, Inc.*, *supra*, 9 Cal.5th at p. 1141.) L'Heureux stated in his declaration he had a

partnership agreement with two other producers, Gianni Nunnari and Bernie Goldmann, to produce a Hard Boiled movie. He contended Boghosian's demands to MGM that he (L'Heureux) receive no production credit on the movie disrupted the agreement. L'Heureux also stated in his declaration he had a separate agreement with Darrow, Miller's Hard Boiled coauthor, granting L'Heureux the rights to produce the movie. L'Heureux submitted a declaration from Mark Lichtman, Darrow's manager (and Miller's manager before 2014), who stated that, during the negotiations with MGM, Thomas (Frank Miller, Inc.'s chief executive officer) "harass[ed] Mr. Darrow," "tried to pressure Mr. Darrow to break his agreement with Mr. L'Heureux," and asked "Mr. Darrow to pressure Mr. L'Heureux to step aside."

The Miller parties argued that, regardless of whether they disrupted the agreements, L'Heureux did not show the alleged interference caused him any damages. L'Heureux's only evidence of damages was his statement that, had he finalized a deal with MGM to produce a Hard Boiled movie, he would have "received credit as a producer, with significant compensation for [his] role . . . ." This was not enough to show prima facie showing of damages resulting from the disruption of the agreements.

To make a prima facie showing on his interference with contract claim, L'Heureux had to show more than that the Miller parties' actions caused him some damage; he had to show damages "resulting" from the breach or disruption of his specific agreements with Nunnari and Goldmann, or with Darrow. (*Ixchel Pharma, LLC v. Biogen, Inc.*, *supra*, 9 Cal.5th at p. 1141; see *Zimmerman v. Bank of America of Nat. Trust and Savings Assn.* (1961) 191 Cal.App.2d 55, 57 [for interference with either contract or prospective economic advantage, the "actionable wrong lies in the inducement to break the contract or to sever the

relationship," and the "essence" of the tort is "a disruption of the relationship"].)  In other words, L'Heureux had to make a prima facie showing the disruption of those agreements was a substantial factor in causing his alleged damages.  (See *Harh v. Diaz-Barba* (2011) 194 Cal.App.4th 1177, 1196 [a breach or disruption of the plaintiff's contract is a "cause of injury, damage, loss or harm" if it "is a substantial factor in bringing about [the] injury, damage, loss or harm"]; *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 391 [same]; see also *Greathouse v. Amcord, Inc.* (1995) 35 Cal.App.4th 831, 837 [the "Supreme Court has . . . definitively adopted the substantial factor test of causation for tort liability"].)

L'Heureux, however, did not present evidence or explain how the purported disruption of his agreements with Nunnari and Goldmann, or with Darrow, was a substantial factor in preventing the MGM deal from moving forward.  For example, had L'Heureux presented evidence Darrow sabotaged the MGM deal by objecting to L'Heureux's involvement after Thomas made the statement to Darrow about L'Heureux, the disruption of the L'Heureux-Darrow agreement may have been a substantial factor in L'Heureux's lost compensation from the MGM deal.  There was no evidence, however, Thomas's statements to Darrow affected Darrow's conduct during the MGM negotiations.  Similarly, there was no evidence Boghosian's efforts to prevent L'Heureux from receiving production credit affected Nunnari's or Goldmann's efforts to finalize a deal.  The evidence was that the reason the MGM deal did not go forward was that Miller and MGM did not agree to the deal.  While the Miller parties' conduct may have contributed to L'Heureux's lost compensation from the MGM deal (for example, because it disrupted the relationship between L'Heureux and MGM), it was not because their conduct disrupted

his agreements with Nunnari and Goldmann or with Darrow. (See *Franklin v. Dynamic Details, Inc.*, *supra*, 116 Cal.App.4th at p. 394 [sales representative failed to show a triable issue of material fact regarding whether the defendant's emails interfered with his contracts with his vendors because "a trier of fact could not draw a reasonable inference" the defendant's emails to vendors "were a substantial factor in bringing about [the sales representative's] lost business merely because the emails preceded the loss"].)

4.      *L'Heureux Showed a Probability of Success on His Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing Against Miller, but Not Against the Other Defendants*

"""Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'" . . . . [¶] The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371-372; see *Bevis v. Terrace View Partners, LP* (2019) 33 Cal.App.5th 230, 252.) "The covenant operates '"as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.'"" (*Cobb v. Ironwood Country Club* (2015) 233 Cal.App.4th 960, 966; see *Ojjeh v. Brown*, *supra*, 43 Cal.App.5th at p. 1037; *Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230,

1244.) "A breach of the implied covenant of good faith is a breach of the contract . . . ." (*Thrifty Payless*, at p. 730; accord, *Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 885; see *Archdale v. American Internat. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 468 [covenant of good faith and fair dealing "is an implied-in-law term of the contract and its breach will necessarily result in a breach of the contract"].)

L'Heureux showed a probability of success on his cause of action against Miller for breach of the implied covenant, based on Miller's statements about L'Heureux's rights to Hard Boiled. L'Heureux submitted the 2009 agreement between Solipsist and Empire, Inc. (one of Miller's companies) granting Solipsist an 18-month option to purchase Hard Boiled. He stated in his declaration that Miller's agent, Lichtman, extended the option agreement on behalf of Miller "in perpetuity," in exchange for L'Heureux's promise to continue working to produce the movie and for "being flexible" with Miller's inability to meet his obligations under the option agreement because of personal issues. Lichtman confirmed in his declaration that he made the offer to L'Heureux and that L'Heureux accepted. L'Heureux showed Miller frustrated the purposes of the agreement when Boghosian told MGM that L'Heureux's option rights had expired and that Miller would not agree to a deal if L'Heureux received producer credit. And L'Heureux showed he was harmed by Miller's breach. L'Heureux submitted an email from Miller's attorney stating MGM had made an offer for the rights to Hard Boiled, which Miller had initially agreed to accept. And as discussed, L'Heureux stated in his declaration he would receive (at least some) compensation under the deal.

45

The Miller parties do not challenge most of L'Heureux's showing. They only contest whether Miller and Frank Miller, Inc. were parties to the agreement that gave L'Heureux the option to purchase Hard Boiled. According to the Miller parties, it was Empire, Inc.—not Miller or Frank Miller, Inc.—that signed the agreement granting Solipsist the option; therefore, Miller and Frank Miller, Inc. cannot be liable for any breach of an implied covenant in the option agreement. This argument works for Frank Miller, Inc., but not for Miller.

In his declaration L'Heureux stated that Lichtman told him that "Mr. Miller would agree to extend my option to produce Hard Boiled . . . ." Lichtman similarly stated that L'Heureux "accepted Mr. Miller's offer to extend his option to produce Hard Boiled . . . ." A reasonable inference from L'Heureux's and Lichtman's declarations is that, when Miller "extended" the option agreement, he was personally offering L'Heureux the option to purchase the rights to Hard Boiled under the terms of the earlier agreement between Solipsist and Empire, Inc. (See *Jenni Rivera Enterprises, LLC v. Latin World Entertainment Holdings* (2019) 36 Cal.App.5th 766, 781 ["[e]vidence supporting a reasonable inference may establish a prima facie case" under the second step of the section 425.16 analysis].) Therefore, L'Heureux met his burden to present prima facie evidence Miller was a party to the agreement granting L'Heureux the Hard Boiled rights. On the other hand, the Miller parties are correct that L'Heureux offered no evidence tying Frank Miller, Inc. to the agreement. Therefore, L'Heureux failed to show a probability of success against Frank Miller, Inc.[8]

---

[8] L'Heureux concedes he did not demonstrate a probability of success against Thomas on this cause of action.

The Miller parties also argue Miller's purported agreement to extend L'Heureux's option rights was not enforceable under section 204(a) of the Copyright Act of 1976, which provides: "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." (17 U.S.C. § 204(a).) Citing a treatise on copyright law (2 Patry on Copyright, § 5:125) (but no cases), L'Heureux argues section 204 does not apply to an "'unexercised option agreement whether revocable or nonrevocable.'"

Given the parties' limited argument, we decline to resolve this issue of federal copyright law at this stage of the proceedings. The Copyright Act defines a "transfer of copyright ownership" as "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." (17 U.S.C. § 101.) Other than citing the applicable code sections, the Miller parties offer little argument regarding why the specific option agreement at issue here would qualify as a transfer of copyright ownership under the Copyright Act. While their conclusion may ultimately be correct, the Miller parties did not meet their burden to show the agreement was unenforceable. (See *Sloan v. Hiatt* (1966) 245 Cal.App.2d 926, 934 [invalidity is generally a defense to an action based on a contract]; *Pappas v. Delis* (1947) 79 Cal.App.2d 392, 398 [party seeking to avoid a contract generally bears burden of showing a contract is void].)

47

## DISPOSITION

The order is reversed. The trial court is directed to vacate its order and enter a new order granting the special motion to strike under section 425.16 in part and denying it in part. The court is directed to enter a new order that (1) strikes all allegations of the Miller parties' press releases and the Miller parties' statements about L'Heureux's rights to Sin City; (2) strikes in their entirety the first, second, third, and fourth causes of action for defamation, intentional interference with contract, and intentional and negligent interference with prospective economic advantage; and (3) strikes the fifth cause of action for breach of the implied covenant of good faith and fair dealing against Frank Miller, Inc. and Thomas (but not Miller). The Miller parties are to recover their costs on appeal.


SEGAL, J.



We concur:



PERLUSS, P. J.



FEUER, J.

48